Mark D. MAJKOWSKI, Plaintiff,

v.

AMERICAN IMAGING MANAGE-MENT SERVICES, LLC, a Delaware limited liability company; and American Imaging Management East, LLC, a Delaware limited liability company, Defendants.

C.A. No. 1797–N.

Court of Chancery of Delaware, New Castle County.

Submitted: Sept. 28, 2006.

Decided: Dec. 6, 2006.

Kevin G. Abrams, J. Travis Laster, Matthew F. Davis, Abrams & Laster, LLP, Wilmington, DE, for Plaintiffs.

Gregory V. Varallo, Geoffrey G. Grivner, Richards, Layton & Finger, P.A., Wilmington, DE; Dennis N. Ryan, Linda R. Stahl, Tonya M. Gray, Andrews Kurth, LLP, Dallas, TX, for Defendants.

## OPINION

STRINE, Vice Chancellor.

### I. *Introduction*

This advancement action is but one of a series of lawsuits that have burdened various courts with bits of one dispute. The plaintiff, Mark D. Majkowski, seeks a declaration that he is entitled to the advancement by the defendants, American Imaging Management Services, LLC and American Imaging Management East, LLC (the "AIM LLCs"), both Delaware limited liability companies, of his attorneys' fees and expenses in connection with a dispute between himself and the defendants' affiliates International Radiology Group, LLC ("IRG"), a Delaware limited liability company, and American Imaging Management, Inc. ("AIM, Inc."), an Illinois corporation (herein referred to collectively as "American Imaging").

The underlying dispute involves claims by Majkowski against American Imaging relating to: (1) Majkowski's former service as President and Chief Financial Officer of American Imaging; (2) his unsuccessful attempts to participate in a management-led buyout of American Imaging; and (3) the ultimate termination of his employment. Majkowski articulated his claims in a letter to American Imaging and sought to resolve them by settlement. Believing Majkowski's claims might impede the pending sale of the company, American Imaging sued him in Texas, seeking a declaration that his claims had no merit. As a result, Majkowski was forced to incur substantial attorneys' fees to defend that

action. Majkowski has contract rights, under agreements that are not at issue in this action, that seem to require American Imaging to advance those litigation expenses to him as he incurs them. But American Imaging has failed to do that, and has spared no expense in trying to deny Majkowski advancement. The result has been a series of unnecessary lawsuits, now involving three separate jurisdictions, that likely have eaten up more attorneys' fees than the parties' spats over the underlying dispute.

The AIM LLCs have moved to compel this Delaware advancement action to arbitration pursuant to a consulting agreement that defined Majkowski's relationship with American Imaging ("the Consulting Agreement"), and alternatively to dismiss on the merits. Majkowski has filed a cross motion for summary judgment on his advancement claim.

In resolving this dispute, I must answer two questions. First, does this advancement dispute "arise out of" or "relate to" the Consulting Agreement such that, according to the terms of that agreement, Majkowski must arbitrate this claim? Second, does Majkowski have a right to advancement under the AIM LLCs' LLC agreements (the "AIM LLC Agreements"), which promise to "indemnify and hold harmless" American Imaging's officers, but which do not mention the word advancement?

On the first question, I conclude that the arbitration provision in the Consulting Agreement is not broad enough to cover this dispute. Therefore, I reach the merits of Majkowski's advancement claim. On that claim, I grant the AIM LLCs' motion to dismiss because the AIM LLC Agreements, by their plain terms, do not grant mandatory advancement rights. As I explain, the argument that the words "hold harmless" grant advancement rights is untenable.

## II. Factual Background And Procedural History

### A.

The relevant facts are not in material dispute. American Imaging is a health care firm that, as of the summer of 2000, was on the brink of bankruptcy. Around that time, Majkowski, a financial consultant who specializes in the health care industry, in partnership with another consultant, David Harrington, prepared a proposal for the two to provide consulting services to American Imaging. In October 2000, American Imaging hired Majkowski and Harrington as financial consultants. The two used DASH Business Group, Inc. ("DASH"), a company solely owned by Harrington, as the vehicle through which they provided their services. American Imaging paid all compensation for the consulting services to DASH, and DASH paid Majkowski his share as salary and bonuses.

The services were initially provided under a letter agreement between DASH and American Imaging. The term of the letter agreement ran from October 2, 2000 to December 1, 2000. After that initial term expired, Majkowski and Harrington continued to provide services to American Imaging, and on January 4, 2001, Majkowski was appointed as American Imaging's acting Chief Financial Officer. Harrington was also appointed acting Chief Executive Officer then. American Imaging continued to pay all of Majkowski's and Harrington's compensation through DASH. A second letter agreement between DASH and American Imaging became effective January 8, 2001. On February 19, 2001, Majkowski was appointed interim CFO and Treasurer. He was appointed to a perma-

nent position as President and CFO on August 1, 2001.

### B.

By August 2001, Majkowski and Harrington had turned American Imaging around, and instead of facing imminent bankruptcy, it had become an attractive acquisition target. After substantial negotiations, DASH and American Imaging entered into a Consulting Agreement on August 10, 2001, under which Majkowski was to continue as President and CFO, and Harrington was to continue to serve as CEO. Notably, neither Majkowski nor the AIM LLCs were parties to the Consulting Agreement. The Consulting Agreement provided for specified immediate cash payments, deferred compensation, equity in American Imaging, and additional bonuses. It also required Majkowski and Harrington to seek to identify potential purchasers of American Imaging, and provided that they would be paid a commission of 5% of the purchase price upon completion of a sale.

The Consulting Agreement also contained two provisions that are particularly relevant to this dispute. Section 3.3, entitled "Disputes," provides that "[a]ny controversy or claim arising out of or related to this Agreement . . . shall be settled by arbitration in Chicago, Illinois." Section 3.7, entitled "Indemnification," provides that American Imaging will "(i) defend and indemnify each Executive against, and advance all costs and expenses (including legal fees) associated with, any . . . lawsuits in any way arising out of such Executive's status as . . . an officer . . . of the Company, . . . and (ii) maintain its applicable organizational documents on a basis consistent with clause (i)."

### C.

After execution of the Consulting Agreement, Majkowski and Harrington sought out purchasers for American Imaging, and received letters of interest from at least two potential acquirers. At the same time, Majkowski and Harrington put together a proposal for a management-led leveraged buyout.[1] On December 3, 2002, American Imaging entered into a Potential Sale of the Company Agreement (the "PSOC Agreement") with Harrington and Majkowski, specifying the minimum economic terms under which American Imaging's Board of Managers would recommend a transaction to American Imaging's stockholders for approval. The PSOC Agreement also provided for a ninety-day exclusivity period, during which American Imaging's Board of Managers was barred from negotiating with anyone other than Majkowski and Harrington or a potential buyer introduced by them.

On December 31, 2002, Majkowski and Harrington submitted an offer to buy American Imaging that satisfied the minimum economic terms set forth in the PSOC Agreement. American Imaging's Board took no action in response to the offer, and the offer expired without substantive negotiation. Majkowski and Harrington then tried to put together other deals with outside purchasers, but nothing materialized. According to Majkowski, American Imaging's Chairman, Hays Lindsley, who effectively controlled American Imaging's Board of Managers, was hostile to the Majkowski–Harrington offer and the other purchasers introduced by them because he wanted to ensure that certain existing shareholders, including two investors with whom he was affiliated, Perot Investments, Inc. and Hunt Capital

---

**1.** The conflict of interest created by this situation appears to have been fully disclosed to,

and waived by, American Imaging's Board of Managers.

Partners, L.P. ("Hunt Capital"), were given an opportunity to participate in a sale transaction. Majkowski considered Lindsley's behavior to be a breach of the PSOC Agreement and of the fiduciary duties he owed to American Imaging and its shareholders. Nonetheless, he and Harrington attempted to play ball with Lindsley by structuring a deal in which Majkowski and Harrington would partner with Hunt Capital to buy American Imaging. But Majkowski still could not get a deal done because Lindsley continued to balk, eventually granting a third party of his choosing, Waud Capital Partners, LLC, rights as an exclusive purchaser.

### D.

By mid–2003, due to Majkowski's frustration over Lindsley's behavior in the sale process, the business relationship between Majkowski and American Imaging's Board had eroded. Harrington sided with Lindsley and the Board, and ultimately, a deal to sell the American Imaging was structured that excluded Majkowski. Majkowski was fired from his officer positions in July 2003, and DASH and American Imaging amended the Consulting Agreement to no longer require Majkowski's services. At the same time, Harrington, on behalf of DASH, wrote to Majkowski informing him that his consulting services were no longer required and offering him a standard severance package.

Majkowski did not respond to this letter until more than a year and a half later— March 7, 2005—when he sent a letter to Harrington and American Imaging outlining various claims that Majkowski believed he had against Harrington, DASH, Lindsley, and American Imaging involving his role in the sale transaction. Among other claims, Majkowski contended that: (1) Harrington had breached the fiduciary duties that he owed to Majkowski by conspiring with Lindsley and the American Imaging Board to put together a deal that excluded Majkowski; (2) Harrington and Lindsley had tortiously interfered with Majkowski's business relationships with American Imaging and certain of its investors and potential acquirers; and (3) Lindsley and American Imaging had violated various duties they owed to Majkowski under the Consulting Agreement, the PSOC Agreement, and the law governing limited liability companies. Majkowski demanded a substantial cash payment, an increased equity position in American Imaging, and certain other concessions in return for a release of those and other claims.

### E.

At the time Harrington and American Imaging received Majkowski's letter, they were still trying to sell American Imaging and claim to have become concerned that Majkowski would frustrate the impending sale. Accordingly, Harrington, DASH, and American Imaging filed a declaratory judgment action in Texas state court (the "Texas Action") seeking a declaration that Majkowski's claims were without merit.

Although Majkowski was nominally a defendant in the Texas Action, the Texas Action sought only a declaratory judgment that Majkowski had no legal or equitable rights against American Imaging or the other parties involved in the proposed sale transaction. Once sued, Majkowski was required to either pursue or lose his claims. Faced with this choice, he asserted by counterclaim the various theories outlined in his earlier letter and sought substantial damages and other remedies against American Imaging, Harrington, Lindsley, and other related defendants. Thus, in one sense, Majkowski was the aggressor in the Texas Action. But the fact that American Imaging was the first

to file suit, forcing Majkowski to defend himself in the Texas court, is important. Although Majkowski initially attempted to informally resolve the dispute by sending a letter outlining the claims he believed he had against American Imaging, when American Imaging filed suit, it denied Majkowski the strategic option of choosing whether or where to sue.

Indeed, by filing suit in Texas, American Imaging, whose principal place of business was in Northbrook, Illinois, bypassed the Consulting Agreement's arbitration provision, and forced Majkowski, a Chicago resident, to defend himself in a far-away court. Further, American Imaging's assertion that the declaratory judgment action was entirely motivated by its concern that Majkowski would frustrate the impending sale is undermined by the fact that shortly after the action was filed, the sale transaction closed, obviating the need for declaratory relief—and yet American Imaging did not dismiss its affirmative declaratory judgment action.

As a result, Majkowski had no practical choice but to file a counterclaim in the Texas action to assert his claims against Harrington, DASH, Lindsley, American Imaging, and the other defendants. American Imaging then did an about-face, and did not object when Lindsley, who was not a party to the original declaratory judgment action, moved to compel arbitration of Majkowski's claims pursuant to the mandatory arbitration provision in the Consulting Agreement. The Texas court granted the motion, finding that Majkowski had to arbitrate his claims in Chicago. Thus, after going down to Texas, hiring local counsel, filing responsive pleadings (and two amended counterclaims), and contesting a motion to compel arbitration, Majkowski was told to go back home and start over with arbitration in Chicago.

To date, no request for arbitration has been filed by either party. American Imaging, having denied Majkowski advancement for any of his expenses incurred in defending the Texas Action, appears content to let the litigation sit idle while Majkowski tries to figure out how to finance an expensive arbitration. At the same time, Majkowski remains in a defensive posture because American Imaging has not dismissed its affirmative declaratory relief claims against him. Majkowski has failed to initiate the arbitration proceedings, perhaps in some measure because he lacks sufficient funds to pursue the matter. To that end, Majkowski is attempting to assert a right to force American Imaging to advance his litigation expenses to him so that he can pay the attorneys' fees he has incurred to date and fund the arbitration proceedings.

F.

■ In determining where and how to assert advancement rights, Majkowski had a number of strategic options. Perhaps the most obvious choice would have been to attempt to enforce the advancement right granted to DASH for his benefit by the Consulting Agreement itself. The indemnification and advancement provision in that Agreement is very broad, and covers all disputes arising out of Majkowski's status as an officer of American Imaging. Further, it clearly provides that American Imaging must pay Majkowski's legal expenses as they are incurred. But American Imaging has taken the position, contrary to its plain-language contract obligations and to Illinois law (which appears to govern the Consulting Agreement), that Majkowski is not entitled to advancement.[2] If the question were in front of me, I would have little

---

**2.** American Imaging appears to be taking the

position that Majkowski is not entitled to in-

difficulty concluding that Majkowski is entitled to advancement under the Consulting Agreement. But to date, Majkowski has not attempted to assert the Consulting Agreement's advancement right because all disputes over rights arising out of the Consulting Agreement (including rights to indemnification and advancement in that agreement) must be arbitrated—and Majkowski apparently does not want to arbitrate an advancement dispute.[3]

Instead, Majkowski has chosen to assert advancement rights arising out of the or-

ganic documents of the various affiliates within the American Imaging family, which do not have arbitration provisions. In October 2005, Majkowski filed suit in Illinois state court (the "Illinois Action"), seeking a declaration that he is entitled to advancement under AIM, Inc.'s articles of incorporation (the "AIM, Inc. Articles"). In November, 2005, he filed this action asserting that he is entitled to advancement under the AIM LLC Agreements.

 Because Majkowski will accomplish his goal by getting a favorable ruling

---

demnification with respect to the underlying dispute because they contend that his actions that gave rise to the dispute were not taken in good faith or otherwise in a manner that Majkowski reasonably believed to be in American Imaging's best interests. But under both Illinois and Delaware law, that consideration is irrelevant to the question of whether Majkowski is entitled to have his litigation expenses advanced to him as they are incurred because advancement rights are not subject to a good faith standard. *Johnson v. Gene's Supermarket, Inc.*, 117 Ill.App.3d 295, 301–02, 72 Ill.Dec. 778, 453 N.E.2d 83 (1983) (relying on Delaware authority in concluding that advancement and indemnification are separate rights, and that a right to advancement, unlike a right to indemnification, is not preconditioned on a finding that the person seeking advancement has met a particular standard of conduct); *see also Homestore, Inc. v. Tafeen*, 888 A.2d 204, 212 (Del.2005) ("The right to advancement is not dependent on the right to indemnification. The right to indemnification requires "success on the merits or otherwise" in defending proceedings brought under section 145(a) or (b). Section 145(e), however, expressly contemplates that corporations may confer a right to advancement that is *greater* than the right to indemnification and recognizes that advances must be repaid if it is ultimately determined that the corporate official is not entitled to be indemnified."); *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del.1992) (distinguishing the right to advancement from the right to indemnification); *Senior Tour Players 207 Management Co. LLC v. Golftown 207 Holding Co. LLC*, 2004 WL 550743, at *2 (Del.Ch.2004) ("This court has consistently held that advancement and indemnification, although obviously related, are

distinct types of legal rights and that the right to advancement is not ordinarily dependent upon a determination that the party in question will ultimately be entitled to be indemnified."). As a practical matter, it is extremely difficult to premise advancement rights on a good faith standard because a determination of whether the indemnitee acted in good faith generally cannot be made until the merits of the underlying controversy are adjudicated. *See Gene's Supermarket*, 117 Ill.App.3d at 302, 72 Ill.Dec. 778, 453 N.E.2d 83 (noting that the Model Business Corporation Act, which had previously conditioned advancement rights on a finding that the officer seeking advancement had met a standard of conduct, was "revised because 'in many instances it proved unworkable' because of its requirement that a determination be made in advance that a person had met a certain standard of conduct") (quoting Orvel Sebring, *Recent Legislative Changes in the Law of Indemnification of Directors, Officers, and Others*, 23 Bus. Law. 95, 114 (1967)); *see also Reddy v. Electronic Data Systems Corp.*, 2002 WL 1358761, at *5 (Del.Ch.2002) ("[I]t is highly problematic to make the advancement right of such officials dependent on the motivation ascribed to their conduct by the suing parties. To do so would be to largely vitiate the protections afforded by § 145 and contractual advancement rights.").

3. Majkowski may have also feared that American Imaging would claim that only DASH, and not anyone else, could enforce the advancement provision in the Consulting Agreement. Given its position on arbitration in this litigation, American Imaging is not well positioned to advance that contention gracefully.

in either this or the Illinois court, he did not pursue this action initially, instead opting to press the Illinois Action first. The reason for this tactical decision is clear. The AIM, Inc. Articles unambiguously provide for both indemnification and advancement rights for all officers of AIM, Inc. and its affiliates.[4] By contrast, the AIM LLC Agreements nowhere mention advancement, and provide only that the AIM LLCs will "indemnify and hold harmless" their officers and the officers of their affiliates—and they will do that only if the officer acted in good faith, and in a manner that he reasonably believed to be in the best interests of the AIM LLCs. The mere right to ultimate indemnification does Majkowski no good at this point. What Majkowski needs is advancement. Given that Delaware clearly recognizes indemnification and advancement as two distinct legal rights,[5] and that absent a specifically worded bylaw providing for mandatory advancement, Delaware law leaves the decision whether to advance litigation expenses to the business judgment of the board,[6] Majkowski knew that he faced an uphill battle in this court.

In response to the Illinois Action, AIM, Inc. filed a motion to compel arbitration and alternatively to dismiss, contending that the Illinois Action arises out of or relates to the Consulting Agreement, and thus must be arbitrated. The Illinois court denied the motion, finding that the Illinois Action was not sufficiently related to the Consulting Agreement to require arbitration because Majkowski became an officer of American Imaging, and thus acquired rights under the AIM, Inc. Articles, before execution of the Consulting Agreement, and because Majkowski was not a signatory to the Consulting Agreement. But AIM, Inc. was successful in obtaining interlocutory appellate review of that decision, and a stay of the trial court proceedings. Majkowski's petition to expedite the appeal was denied. Accordingly, it may be some time before the appeal is resolved. As a result, Majkowski now turns to this court to press his claims to advancement under the AIM LLC Agreements.

### III. *Legal Standard*

American Imaging has filed a motion to dismiss Majkowski's claim to advancement under the AIM LLC Agreements for failure to state a claim, and Majkowski has cross moved for summary judgment. Because I resolve these motions by granting American Imaging's motion to dismiss, my analysis is governed by the familiar Rule 12(b)(6) standard, which requires me to accept all well-pled allegations of fact as true and draw all reasonable inferences in

---

4. The relevant provision of the AIM, Inc. Articles provide as follows:

The Corporation ... shall to the fullest extent now or hereafter permitted by law, indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending, or completed ... proceeding ... by reason of the fact that such person ... was ... an officer of the Corporation ... against expenses (including attorneys' fees) incurred by such person in connection with such ... proceeding ... if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation....

...
Expenses ... shall be paid by the Corporation in advance of the final disposition of such ... proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount, unless it shall ultimately be determined that such person is entitled to be indemnified by the Corporation....

Plaintiff's Op. Brief, Ex. H, at 6–7.

5. *E.g., Advanced Mining Systems, Inc. v. Fricke,* 623 A.2d 82, 84 (Del.Ch.1992).

6. *Id.*

Majkowski's favor.[7] I need not, however, accept as true conclusory assertions unsupported by specific factual allegations.[8] If, after these principles are applied, I conclude that the facts fail to support a valid cause of action, I must grant the motion to dismiss.[9]

■ In deciding this motion, I also apply familiar principles of contract interpretation. Under Delaware law, the proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language.[10] When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning.[11] Only where there are ambiguities may a court look to collateral circumstances; otherwise, only the language of the contract itself is considered in determining the intentions of the parties.[12]

## IV. The Consulting Agreement Does Not Require Majkowski To Arbitrate This Advancement Dispute

### A.

■ American Imaging contends that this advancement action falls within the scope of the mandatory arbitration provision in the Consulting Agreement, and, as a result, must be submitted to arbitration instead of being decided by this court. In deciding whether this advancement dispute is properly committed to arbitration,[13] I note that Delaware arbitration law mirrors federal law,[14] and that it is well settled federal policy, as well as the policy of this state, that arbitration is a favored method for resolving disputes.[15] Accordingly, con-

7. E.g., *In re Lukens, Inc. Shareholders Litig.*, 757 A.2d 720, 727 (Del.Ch.1999).

8. E.g., *H–M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 139 (Del.Ch.2003).

9. E.g., *Kohls v. Kenetech Corp.*, 791 A.2d 763, 767 (Del.Ch.2000).

10. E.g., *OSI Systems, Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1090 (Del.Ch.2006).

11. E.g., *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del.1992).

12. E.g., *Citadel Holding Corp., v. Roven*, 603 A.2d 818, 822 (Del.1992); *Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del.1997).

13. In *James & Jackson LLC v. Willie Gary LLC*, 906 A.2d 76, 80 (Del.2006), the Delaware Supreme Court held that an express contractual reference to the Rules of the American Arbitration Association (the "AAA Rules"), which provide that the question of substantive arbitrability (i.e., whether a dispute must be arbitrated or not) may be submitted to an arbitrator, signals an intent of the parties to submit the substantive arbitrability issue to arbitration and requires this court to defer to the arbitrator on that question. Because the Consulting Agreement provides for arbitration to be conducted in accordance with the AAA Rules, had the AIM LLCs timely made the proper argument, I would have been required to dismiss or stay this action pending an arbitrator's determination of the substantive arbitrability issue. In briefing this motion, the AIM LLCs did not contend that substantive arbitrability must be decided by an arbitrator even though the Supreme Court decided *Willie Gary* before the AIM LLCs filed their reply brief. Instead, they first took that position at oral argument. "It is settled Delaware law that a party waives an argument by not including it in its brief." *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del.Ch.2003), aff'd, 840 A.2d 641 (Del.2003); see also *In re IBP, Inc. Shareholders Litig.*, 789 A.2d 14, 62 (Del.Ch. 2001) (finding that a party waived an argument by not addressing it in its opening post-trial brief). Accordingly, the AIM LLCs have waived this argument and I must determine the substantive arbitrability question myself.

14. *Willie Gary*, 906 A.2d at 80.

15. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225–26, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 1987 WL

tractual arbitration clauses are generally interpreted broadly in furtherance of that policy.[16]

On the other hand, both Delaware and federal law are clear that parties cannot be compelled to arbitrate claims unless the contract at issue requires that result.[17] In *Parfi Holding AB v. Mirror Image Internet, Inc.*,[18] the Delaware Supreme Court reconciled this rule with the public policy favoring arbitration as follows:

> [A]rbitration is a method of dispute resolution created by contract. An arbitration clause, no matter how broadly construed, can extend only so far as the series of obligations set forth in the underlying agreement. Thus, arbitration clauses should be applied only to claims that bear on the duties and obligations under the Agreement. *The policy that favors alternate dispute resolution mechanisms ... does not trump basic principles of contract interpretation.*[19]

Accordingly, to determine whether this advancement action is subject to mandatory arbitration under the Consulting Agreement, I need only consider the plain meaning of the arbitration provision's language, and decide whether this action "arises out of" or "relates to" the Consulting Agreement such that it falls within the arbitration provision's scope.[20]

In *Parfi*, the Delaware Supreme Court established a framework for determining whether a dispute is properly committed to arbitration by creating the following two-part test:

> First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.[21]

The contract language at issue in *Parfi* was very similar to the contract language that I must interpret in this case. In *Parfi*, the parties had agreed to arbitrate all claims "arising out of or in connection

---

13520, at *8 (Del.Ch.1987) ("Both Delaware and federal law recognize a strong public policy in favor of arbitration.").

16. See, e.g., *Hercules, Inc. v. Orbital Sciences Corp.*, 1995 WL 125795, at *3 (Del.Ch.1995).

17. *DMS Properties–First, Inc. v. P.W. Scott Assoc., Inc.*, 748 A.2d 389, 391 (Del.2000) ("A party cannot be forced to arbitrate the merits of a dispute ... in the absence of a clear expression of such intent in a valid agreement."); *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *1 (Del.Ch.2006) (noting that federal law and Delaware law agree in the important sense that an arbitration clause "only requires a party to arbitrate a dispute that is otherwise litigable in court when the party has a contractual (or equitably

enforceable) duty to do so"), *aff'd*, 906 A.2d 76 (Del.2006).

18. 817 A.2d 149 (Del.2002).

19. *Id.* at 156 (citations omitted) (emphasis added).

20. Notably, the Consulting Agreement has no choice of law provision. None of the parties have argued that Illinois contract law principles—the ones most likely relevant—differ from Delaware law. Both parties relied on Delaware cases in briefing the arbitrability question and I have relied on this rare agreement between them.

21. *Parfi*, 817 A.2d at 155.

with" the contract.[22] In performing the first step in its two-part analysis, the Delaware Supreme Court determined that this was a "broad" arbitration provision.[23] I have no difficulty concluding that the contract language here, requiring the parties to arbitrate all disputes that "arise out of" or "relate to" the Consulting Agreement, has little functional difference than the language at issue in *Parfi*, and that it is also "broad" in scope.

 But that does not end the inquiry. *Parfi* held that the existence of a "broad" contractual arbitration provision does not require the parties to arbitrate all disputes that might arise between them. To the contrary, according to the *Parfi* decision, a "broad" arbitration clause signals only an intent to arbitrate matters that touch on contract rights and performance.[24] *Parfi* holds that even claims that arise out of the same nucleus of operative facts as an arbitrable contract claim do not have to be arbitrated, even by a plaintiff invoking the right to arbitration in a related matter. Indeed, *Parfi* held that where a contract contained a broad arbitration clause, a plaintiff could arbitrate a claim that an issuer breached a contractual prohibition against any unfairly dilutive capital calls, while at the same time litigating in this court the identical contention that the issuer's board, by making the unfair capital calls, had breached its fiduciary duty. The

reason this claim splitting was allowed? The fiduciary duty claim did not depend on the contract even though the plaintiff's contract claim was identical in all material factual and legal respects. As *Parfi* put it, "purportedly independent actions do not touch matters implicated in a contract if the independent cause of action could be brought had the parties not signed a contract."[25] The question then is whether the purportedly arbitrable lawsuit depends on the existence of the contract containing the arbitration clause.[26] Applied to this case, even though the Consulting Agreement provides for the very rights that Majkowski is trying to assert here, under *Parfi*, Majkowski need not arbitrate this advancement action if he seeks to establish rights to advancement without reference to the Consulting Agreement.[27]

## B.

 As an initial matter, I note that the AIM LLCs are not parties to the Consulting Agreement. As a result, it is unclear on what theory they are even entitled to assert rights under it. But with that distraction aside, under *Parfi's* rubric, this dispute would not be arbitrable anyway because Majkowski can assert rights under the AIM LLC Agreements without ever mentioning the Consulting Agree-

---

22. *Id.*

23. *Id.*

24. *Id.* at 156 & n. 23 (explaining that broad arbitration clauses create a presumption of arbitrability only with respect to matters that implicate contract construction or the parties' contract rights and obligations) (citing *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)).

25. *Parfi*, 817 A.2d at 156 n. 24.

26. *See id.* at 155.

27. *Parfi* does not hold, and I do not mean to imply that an advancement action, like this one, could never fall within the scope of a very broadly drafted arbitration provision. Employment contracts often provide for mandatory arbitration of all disputes between an employer and an employee "of any nature whatsoever arising out of or connected with *[the] employment.*" *See* JAY E. GRENIG, ALTERNATIVE DISPUTE RESOLUTION § 11.158 (3d ed. 2005) (emphasis added).

ment.[28] An officer of American Imaging acquires rights under the AIM LLC Agreements the moment he becomes an officer. Therefore, Majkowski acquired rights under the AIM LLC Agreements in January 2001 when he was first appointed acting CFO of American Imaging—a full eight months before the Consulting Agreement was executed. He also acquired rights under the AIM LLC Agreements when he was appointed President and CFO on August 1, 2001. The Consulting Agreement was not executed until ten days later. Majkowski's rights under the AIM LLC Agreements rather obviously do not depend upon a contract that did not exist at the time he acquired the rights. Before August 10, 2001, Majkowski's employment as an officer of American Imaging had no relation to the (then non-existent) Consulting Agreement, and thus the rights that he acquired under the AIM LLC Agreements by virtue of his officer status could only have depended upon, if anything, the two letter agreements that were executed on October 2, 2000 and January 8, 2001 respectively. Neither of those agreements contain an arbitration clause. Had Majkowski been sued in his capacity as an officer of American Imaging before August 10, 2001, he would have been entitled to assert indemnification rights under the AIM LLC Agreements, and would not have been required to arbitrate a dispute over those rights pursuant to the Consulting Agreement because that Agreement did not yet exist. Majkowski's rights under the AIM LLC Agreements did not suddenly change when the Consulting Agreement was executed.

In *Parfi*, Chief Justice Veasey relied heavily on the fact that the plaintiffs' fiduciary duty claims arose by operation of Delaware law independent of the execution of the contract that contained the broad arbitration clause, and that the issuer's other minority shareholders, who were not parties to the contract, possessed identical fiduciary duty claims. The point was that the plaintiffs' claims were not "in connection with" the contract because they could have been brought whether the contract existed or not, and because non-parties to the contract could bring the same claims. Likewise, here, the rights granted by the AIM LLC Agreements arose from those separate Agreements, and this advancement action could have been brought regardless of whether the Consulting Agreement had ever been executed. The rights granted by the AIM LLC Agreements similarly are held by all of American Imaging's officers, and not just the parties to, or beneficiaries of, the Consulting Agreement. Had the parties to the Consulting Agreement intended that an advancement action under the AIM LLC Agreements fall within the scope of the Consulting Agreement's arbitration provision, they could have agreed to arbitrate all disputes related to Majkowski's employment and to bind reciprocally all American Imaging af-

**28.** In making its substantive contention that the indemnification provisions of the AIM LLC Agreements in fact also grant advancement rights, Majkowski initially argued that the portion of the Consulting Agreement's indemnification provision that required American Imaging to maintain its organizational documents in a manner to provide for advancement rights reflects that the parties believed that the AIM LLC Agreements did in fact grant such rights because no changes were made to them after the execution of the Consulting Agreement. In other words, Majkowski initially attempted to rely on the terms of the Consulting Agreement to prove his right to advancement under the AIM LLC Agreements. If pressed, this argument would strongly undermine Majkowski's position that this advancement claim is not subject to arbitration. But Majkowski has withdrawn this argument, and given the liberality expressed by *Parfi*, it would be inappropriate for me to punish him for this infelicity.

filiates to that contract. The parties did not do either, and instead agreed only to arbitrate claims between themselves that "arise out of" or "relate to" the Consulting Agreement. According to *Parfi*, this dispute is independent of that Agreement, and does not fall within the scope of such an arbitration clause.

The fact that Majkowski is, in this action, asserting an independent set of rights is further illustrated by the provision in the Consulting Agreement that requires American Imaging to maintain its organizational documents in such a manner as to provide advancement rights. As I discuss below, the AIM LLC Agreements fail to provide such advancement rights, and, as a result, Majkowski has a meritorious breach of contract claim against American Imaging. That claim, for breach of the Consulting Agreement, must, of course, be arbitrated. The purpose of this separate right seems to be to give DASH (and its beneficiaries Majkowski and Harrington) a club to wield if the AIM LLCs, which are not parties to the Consulting Agreement, do not maintain bylaws with advancement rights. If they do not do so and Majkowski is unsuccessful in seeking advancement against them, he may seek to prosecute a breach of contract action under the Consulting Agreement in arbitration.

## C.

American Imaging next contends that the AIM LLC Agreements are so intertwined with the Consulting Agreement that the Consulting Agreement's arbitration provision applies to the advancement rights granted by that separate Agreement. But this contention, which is based on the fact that the Consulting Agreement required American Imaging to cause the AIM LLC Agreements to include advance-

ment rights, also fails. In making this argument, American Imaging relies primarily on *Yuen v. Gemstar–TV Guide International, Inc.*[29] for the proposition that the Consulting Agreement's reference to the other independent sources of indemnification and advancement rights evidences the parties' intent to select arbitration as the forum for resolving all indemnification and advancement disputes. But *Yuen* does not stand for such a broad proposition, and is factually distinguishable from the situation here.

In *Yuen*, two corporate officers executed a series of agreements (the "Termination Agreements") as part of a corporate restructuring, pursuant to which the two officers had agreed to step down from their roles as CEO and CFO respectively. At the time the agreements were executed, the company was awash in a number of stockholder and securities class action lawsuits, in which the two officers were named as defendants. As part of the Termination Agreements, the company granted the two officers broad indemnification and advancement rights, and specifically referenced the ongoing litigation as being among the lawsuits for which the company would pick up the tab. The Termination Agreements also included a broad arbitration provision. The two officers then tried to come to this court to litigate independent advancement claims arising out of the company's certificate of incorporation for the lawsuits specifically mentioned in the Termination Agreements, claiming, as Majkowski does here, that they did not have to arbitrate a dispute over those independent rights. Vice Chancellor Lamb concluded that because the Termination Agreements specifically mentioned the very lawsuits for which the officers were seeking advancement and provided that the parties would arbitrate all disputes

29. 2004 WL 1517133 (Del.Ch.2004).

involving advancement rights for those lawsuits, a fair reading of the Termination Agreements was that the parties intended to arbitrate the advancement dispute.[30] In other words, when the parties were negotiating the Termination Agreements, they knew that the precise advancement dispute involved was likely coming—because they expressly provided for it in the contract—and specifically waived their rights to litigate that dispute, and agreed instead to resolve the claims in arbitration. Because the specific lawsuits were mentioned in the Termination Agreements, it was clear that the parties had expressly negotiated over all advancement rights with respect to those lawsuits, and that they had chosen arbitration as the forum to resolve any disputes.

In contrast to the situation in *Yuen*, DASH and American Imaging executed the Consulting Agreement on a clear day when no particular litigation was pending, or even contemplated. As a result, because they did not reference any specific dispute over rights that existed independently of the Consulting Agreement, no inference arises that the parties intended to choose arbitration as the forum for resolving disputes over those separate rights that might someday arise—especially when the nature of the reference recognizes the independence of those separate rights by requiring American Imaging to provide for them in separate agreements that did not include arbitration clauses.

For all of these reasons, I conclude that this dispute is not subject to the mandatory arbitration provision of the Consulting Agreement.

## V. *Majkowski Has No Rights To Advancement Under The AIM LLC Agreements*

### A.

▮▮▮▮ I now turn to Majkowski's substantive contention that the AIM LLC Agreements grant him advancement rights. Delaware law has traditionally recognized that indemnification and advancement are two distinct and different legal rights, with the latter being a narrower and more provisional subset of the former.[31] Indemnification is the right to be reimbursed for all out of pocket expenses and losses caused by an underlying claim.[32] The right is typically subject to a requirement that the indemnitee have acted in good faith and in a manner that he reasonably believed was in the best interests of the company.[33] As a result, an indemnification dispute generally cannot be resolved until after the merits of the underlying controversy are decided because the good faith standard requires a factual inquiry into the events that gave rise to the lawsuit.[34] Advancement, by contrast, is a right whereby a *potential* indemnitee has the ability to force the company to pay his litigation expenses as they are incurred regardless of whether he will ultimately be entitled to indemnification.[35] Advancement is typically not conditioned on a finding that the party seeking advancement has met any standard of con-

---

30. *Id.* at *3–4.

31. *See, e.g., Advanced Mining Systems, Inc. v. Fricke,* 623 A.2d 82, 84 (Del.Ch.1992).

32. *Id.*

33. *Id.*

34. R. Franklin Balotti & Jesse A. Finklestein, Delaware Law of Corporations and Business Organizations § 4.24, at F–21–146–47 (3d ed. 2006) ("Prejudgment indemnification beyond mere advancement of expenses is problematic.").

35. *Id.* at § 4.25.

duct.[36] A grant of advancement rights is essentially a decision to advance credit to the company's officers and directors because the officer or director must repay all sums advanced to him if it is later determined that he is not entitled to be indemnified.[37]

### B.

In this case, it is undisputed that the AIM LLC Agreements contain no express mention of any mandatory advancement rights. The contract language at issue reads as follows:

*Indemnification of Member(s).* The Company shall indemnify and hold harmless the member(s) and their affiliates ... and their respective directors, officers, and constituent partners, employees and advisors and other representatives (individually an "Indemnitee"), as follows:

(a) In any threatened, pending, or completed action ... to which an Indemnitee was or is a party or is threatened to be made a party by reason of the fact that such Indemnitee is or was a member or an affiliate of a member ... or a director, officer, employee, or constituent partner of a member or an affiliate of a member, ... the Company shall indemnify such Indemnitee against attorneys' fees, judgments, fines, penalties, settlements, and reasonable expenses actually incurred by such Indemnitee in connection with the defense or settlement of such action, suit, or proceeding, if such Indemnitee acted in good faith ... [and] in a manner reasonably believed by such Indemnitee to be in the best interests of the Company.

This is a standard, straight-forward indemnification provision, devoid of any ad-vancement rights. But Majkowski attempts to find an advancement right where no court has ever found one before—in the phrase "hold harmless." Majkowski claims that in order to avoid reading that phrase as mere surplusage, it must be given a different meaning than the word "indemnify." Majkowski then urges me to focus on what he claims is the "usually accepted" meaning of the phrase "hold harmless," so as to render him "free from harm, liability, or loss." Majkowski claims that he is "harmed" the moment he is forced to pay litigation expenses from his own account. Unless he is given advancement rights, he will not be "free from harm" because he may ultimately be unable personally to fund the litigation to the point where he will be vindicated, and found entitled to indemnification.

### C.

■■■■ Although I sympathize with Majkowski's frustration over his predicament, especially since he appears to have clear advancement rights from other sources, the argument he makes in this court is unpersuasive. The only authority on which Majkowski relies for the proposition that a right to be "held harmless" includes a right to advancement is *Winchester Repeating Arms Co. v. United States*,[38] a ninety-year-old case from the United States Court of Claims that does not even support his proposition. In *Winchester*, the plaintiff was attempting, after the conclusion of the underlying litigation, to recover attorneys' fees it expended in defending a patent infringement suit pursuant to an agreement whereby the defendant had promised to hold the plaintiff harmless from that suit. The defendant

---

36. *Reddy,* 2002 WL 1358761, at *9.

37. *Advanced Mining Systems,* 623 A.2d at 84.

38. 51 Ct.Cl. 118 (Ct.Cl.1916).

contended that while the hold harmless provision required it to pay any judgment or fine levied against the plaintiff in the suit, it did not obligate it to pay the plaintiffs' attorneys' fees. The court interpreted the phrase "hold harmless" to require that the plaintiff be made "free from harm," and held that even though the agreement did not specifically provide for the plaintiff to recover attorneys' fees, the plaintiff would have been harmed by the suit unless it was permitted to recover all sums, including attorneys' fees, that it expended in its defense. Notably, however, *Winchester*, quite unlike modern Delaware advancement actions, was not a summary pre-merits proceeding. Instead, it was a post-merits proceeding to recover attorneys' fees that had been expended over the course of an eight-year lawsuit. The *Winchester* court essentially held that a right to be held harmless was equivalent to a right to be indemnified for all expenses, including attorneys' fees. For the *Winchester* court, the right to be held harmless was not necessarily a right to have attorneys fees advanced as they are incurred, but instead, a right to be made whole eventually. Indeed, the plaintiff in *Winchester* never even attempted to have its attorneys' fees advanced to it as they were incurred, and the court never even considered whether the plaintiff would have been entitled to that right.

### D.

As a general matter, Majkowski is correct that courts attempt to interpret each word or phrase in a contract to have an independent meaning so as to avoid rendering contractual language mere surplusage. But the interpretation of the phrase "indemnify and hold harmless" that Majkowski urges would involve an extreme application of a contractual interpretation technique that is properly used only as a guide in determining the objective intent of the original parties to a contract. It is not a technical rule of law designed to trap a careless draftsperson into including a contract right that he did not mean to include. And it does not change the fact that courts will not bend contract language to read meaning into the words that the parties obviously did not intend.

The terms "indemnify" and "hold harmless" have a long history of joint use throughout the lexicon of Anglo–American legal practice. The phrase "indemnify and hold harmless" appears in countless types of contracts in varying contexts.[39] The

**39.** *See* 3 WILLISTON ON CONTRACTS 4TH FORMS § 54F:20 (in an employment contract: "the Company shall indemnify and hold harmless Employee from any and all claims, liabilities, losses, damages, and expenses, including reasonable attorneys' fees, as a result of acts of the Employee performed in the course and within the scope of the Employee's employment."); *id.* at § 50F:122 (in a commercial lease: "Lessee agrees to indemnify, hold harmless, and defend lessor at lessee's cost against all claims for damages to persons or property arising out of or connected with lessee's operation on or occupancy of the premises."); *id.* at § 54F:26.1 (in a railroad locomotive lease agreement: "[Lessor] shall enter and occupy Lessee's property at its sole risk and shall be subject at all times to Lessee's operating and safety requirements. Any injury, death, or property damage arising out of such entry, occupancy and inspection shall be the entire responsibility of [Lessor] and [Lessor] will indemnify and hold harmless Lessee from any and all such liabilities."); *id.* at § 61F:53.5 (in a performance bond: "the Surety shall defend, indemnify, and hold harmless the City from all claims, suits, causes of actions [sic], and demands (including as costs of litigation and a reasonable attorneys' fee), which are brought against the City ... by reason of payment to the Surety."). Notably, some of the above examples involved contract language that also separately required the indemnitor to "defend" the indemnitee with respect to particular proceedings. I note that if the AIM LLC Agreements had similarly used the word "defend,"

plain fact is that lawyers have become so accustomed to using the phrase "indemnify and hold harmless" that it is often almost second nature for the drafter of a contract to include both phrases in referring to a single indemnification right. Indeed, were I to hold for Majkowski in this case, I imagine many transactional lawyers would be quite surprised to learn that by using the phrase "indemnify and hold harmless," they had all along unwittingly been creating mandatory advancement rights.

As a result of its traditional usage, the phrase "indemnify and hold harmless" just naturally rolls off the tongue (and out of the word processors) of American commercial lawyers. The two terms almost always go together. Indeed, modern authorities confirm that "hold harmless" has little, if any, different meaning than the word "indemnify." Black's Law Dictionary in fact defines "hold harmless" by using the word "indemnify." [40] It defines "hold harmless agreement" as a "contract in which one party agrees to indemnify the other." [41] In defining "hold harmless

clause," it simply says "[s]ee INDEMNITY CLAUSE." [42] Given the clear distinction that our law draws between indemnification and advancement rights, the argument that a right to be held harmless includes a right to advancement cannot stand up in light of the fact that the phrase "hold harmless" is actually defined by reference to indemnification rights.

### E.

Our law has never denied that advancement is a subsidiary concept within the broader topic of indemnification. But it has maintained for a generation that the terms advancement and indemnification are not synonymous. Because rights to indemnification and advancement differ in important ways, our courts have refused to recognize claims for advancement not granted in specific language clearly suggesting such rights. [43] And as a result of the traditional association of the phrase "hold harmless" with the concept of indemnification, that phrase in no way suggests that the drafters of the AIM LLC Agree-

Majkowski would have a stronger argument because the obligation to "defend" comes closer to suggesting the active employment of attorneys and continual payment as the attorneys' fees are incurred. But the AIM LLC Agreements are conspicuously devoid of any obligation on the part of American Imaging to "defend" its officers against any suits. Further, where an indemnitor is under an obligation to "defend" the indemnitee, the contract generally provides that the indemnitee give the indemnitor timely notice of the proceeding, a requirement that is also missing from the AIM LLC Agreements.

40. BLACK'S LAW DICTIONARY 749 (8th ed. 2004) ("**hold harmless,** *vb.* To absolve (another party) from any responsibility for damage or other liability arising from the transaction; INDEMNIFY.—Also termed *save harmless*.") (capitals and emphasis in original).

41. *Id.*

42. *Id.* (capitals in original).

43. *See Advanced Mining Systems,* 623 A.2d at 84 ("A by-law mandating the advancement of funds on the receipt of an undertaking to repay deprives the board of an opportunity to evaluate the important credit aspects of a decision with respect to advancing expenses.... [T]he better policy, more consistent with the provisions of Section 145(e), is to require any such by-law expressly to state its intention to mandate the advancement by the corporation of arguably indemnifiable expenses...."); *Havens v. Attar,* 1997 WL 695579, at *1 (Del.Ch.1997) ("[A]bsent a specifically worded by-law providing for mandatory advancement, 8 *Del. C.* § 145(e) leaves to the business judgment of the board the task of determining whether the undertaking proffered in all of the circumstances, is sufficient to protect the corporation's interest in repayment and whether, ultimately, advancement of expenses would on balance be likely to promote the corporation's interests.").

ments intended to include the very different right of advancement. Reasonable lawyers drafting indemnification and advancement provisions understand that they are dealing with two distinct types of rights. As a result, they typically create separate provisions to address the two different topics. Indeed, this is precisely how the AIM, Inc. Articles, which clearly provide an advancement right, were drafted.[44] In fact, a number of leading treatises suggest forms for indemnification provisions that both use the phrase "indemnify and hold harmless" in the indemnification section, and include a separate explicit provision for advancement.[45] A survey of indemnification provisions that appear in recent cases in this court reveals that many practitioners also use the "indemnify and hold harmless" language alongside a separate explicit advancement provision.[46] I do not mean to suggest that our law requires the use of any particular contractual template in order to create advancement rights. But the fact that so many distinguished treatise writers and experienced business lawyers drafted indemnification and advancement provisions in this way suggests that no reasonable lawyer would read the phrase "hold harmless" to include a right to advancement. Further, by importing an advancement right into the

phrase "hold harmless," I would render meaningless the advancement provisions in the multitude of extant contracts that use the phrase "indemnify and hold harmless" and that also include the separate advancement provision.[47] The irony is that while Majkowski implores me not to render the phrase "hold harmless" meaningless, if "hold harmless" means advancement, then all that other advancement language serves no purpose.

Majkowski attempts to bolster his argument by pointing out that 6 *Del. C.* § 18–108, the Delaware Limited Liability Company Act provision that has often been looked to as the source of power to grant mandatory advancement rights in an LLC agreement,[48] like the contract provision at issue here, also fails to mention advancement at all. That statute reads in pertinent part: "a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever." [49] Majkowski claims that the power to grant mandatory advancement rights must come from the phrase "hold harmless," and thus that same phrase in the LLC Agreements must grant Majkowski advancement rights.

**44.** *See* Plaintiff's Op. Brief, Ex. H, at 6–7, *supra* note 4.

**45.** *See* BALOTTI & FINKLESTEIN § 21.1, at F–21–146–47 (3d ed. 2006); FLETCHER CORP. FMS § 102.30 (4th ed. 1999); MARTIN I. LUBAROFF & PAUL M. ALTMAN, DELAWARE LIMITED PARTNERSHIPS F–43 (2003).

**46.** *See, e.g., DeLucca v. KKAT Management LLC,* 2006 WL 224058, at *7 (Del.Ch.2006); *Senior Tour Players 207 Management Co. LLC v. Golftown 207 Holding Co. LLC,* 2004 WL 550743, at *2 (Del. Ch.2004); *Weinstock v. Lazard Debt Recovery GP, LLC,* 2003 WL 21843254, at *3 (Del.Ch.2003).

**47.** As noted, this technique in the crafting of the governing instruments of entities is consistent with contracts in other commercial contexts, which separately provide for a duty to defend even when the contract otherwise offers indemnification and hold harmless rights. *See* note 39, *supra.*

**48.** *See, e.g., Delphi Easter Partners Limited Partnership v. Spectacular Partners, Inc.,* 1993 WL 328079, at *2 (Del.Ch.1993) (interpreting § 108 of the Delaware Limited Partnership Act, which is identical to the indemnification provision in the Limited Liability Company Act).

**49.** 6 *Del. C.* § 18–108.

But the advancement cases that rely on § 108 of the Limited Liability Company Act and the Limited Partnership Act never look to the phrase "hold harmless" as providing the authority to grant mandatory advancement rights. Indeed, the legal authority for an LLC agreement to grant mandatory advancement rights has never been questioned in this court. In *Delphi Easter Partners,* Chancellor Allen made clear that § 108 "defers completely to the contracting parties to create and delimit rights and obligations with respect to indemnification and advancement." [50] The point of § 108 is that the parties to these agreements have complete freedom of contract—they are free to contract for advancement because neither the statute nor any principle of law or equity prohibits it. To hold that the phrase "hold harmless" automatically includes a right to advancement would, in fact, risk infringing upon that freedom by creating a potential trap for a careless draftsperson accidentally to include contractual advancement rights that were not intended. As Chancellor Allen put it in *Advanced Mining Systems,* because mandatory advancement rights deprive the board of the opportunity to evaluate the important credit aspects of a decision to advance expenses, "the better policy . . . is to require [the documents] to expressly state their intention to mandate advancement." [51] "Hold harmless" does not do that.

### F.

In pressing this claim, Majkowski would have me ignore both the technical and narrow usage of the phrase "hold harmless" as it appears in modern, sophisticated business contracts, and a generation of this court's jurisprudence regarding the separateness of indemnification and advance-

ment rights. Majkowski urges me focus on an overly-broad reading of the phrase that imports far more substance into it than it is worth. He points out that "harmless," standing alone, means "free from harm, liability, or loss," and claims that he is not being "held harmless" the moment he is forced to pay litigation expenses out of his own pocket. I am not convinced that this is the proper method of interpreting what is essentially a piece of legal jargon. But even if I were to indulge Majkowski's attempts to impart such substance into this very insubstantial phrase, I note that Majkowski can be made "free from harm, liability, or loss" without having an advancement right. Indeed, that is precisely what indemnification does. When, and if, the proper tribunal determines that Majkowski is entitled to indemnification, he will be reimbursed for all out of pocket expenses, and will be left "free from harm." Just as in *Winchester,* he will be made whole.

In interpreting the meaning of "hold harmless," I keep in mind that we live in an imperfect world. Bad things happen, and there is often nothing anyone can do to prevent them, ahead of time, from happening. When a person promises to hold another harmless, he does not promise to prevent harm from occurring. That would be an impossible promise to keep. When American Imaging promised to indemnify and hold Majkowski harmless, it simply promised in the traditional and accepted parlance of the commercial world, under certain circumstances, to make things right if harm did occur—and even if Majkowski is, for some reason, unable to vindicate the advancement rights he has under the Consulting Agreement and the AIM, Inc. Articles, that is precisely what the

---

**50.** *Delphi Easter Partners,* 1993 WL 328079, at *2.

**51.** *Advanced Mining Systems,* 623 A.2d at 84.

AIM LLCs will have to do under the terms of this plain-vanilla indemnification provision.

Indeed, Majkowski's proffered interpretation of the AIM LLC Agreements' identical indemnification provisions is belied by their very structure. The provisions make clear that the good faith standard of conduct that our law requires to be met before an officer can be indemnified in fact applies to Majkowski's "hold harmless" right. The provisions grant the indemnification and hold harmless right in the introductory section. They then use the phrase "as follows" to explain and limit the rights. In subparagraph (a) of the provisions, the contracts state that an officer will be entitled to indemnification and hold harmless rights only if he acted in good faith and in a manner that he reasonably believed to be in the best interests of the company. By simple logic then, the "hold harmless" right in these Agreements cannot possibly mean that American Imaging must advance litigation expenses to Majkowski under them. Even if "hold harmless" did mean "advancement," the advancement right would be meaningless because the good faith standard would make it impossi-

ble to adjudicate the advancement dispute until the underlying controversy was resolved.[52]

## G.

As a last-ditch effort, Majkowski contends that at the very least, the meaning of the phrase "hold harmless" is ambiguous, and should be interpreted against American Imaging to provide for advancement rights.[53] He also claims that it should be interpreted in light of Delaware's strong public policy of reading advancement and indemnification provisions broadly in hopes of attracting capable individuals into corporate service.[54] But the term "hold harmless" is not ambiguous. Lawyers have been using the term in conjunction with the word "indemnify" for generations, if not centuries. "Indemnify and hold harmless" is a legal term of art that does not include the unique concept of advancement as it functions within the rubric of Delaware's law of limited liability companies. I will not distort the contract language in the AIM LLC Agreements under the guise of construing it to give Majkowski a contract right that simply is not there.[55] The public policy in favor of

**52.** *Reddy,* 2002 WL 1358761, at *9.

**53.** *See, e.g., SI Mgmt. L.P. v. Wininger,* 707 A.2d 37, 43 (Del.1998) (applying the principle that ambiguities in unilaterally drafted contracts are construed against the drafter to a limited partnership agreement); *Greco v. Columbia/HCA Healthcare Corp.,* 1999 WL 1261446, at *13 (Del.Ch.1999) (applying the same principle to construe a certificate provision regarding indemnification and advancement, to the extent it was ambiguous, against the corporation).

**54.** *See Homestore, Inc. v. Tafeen,* 888 A.2d 204, 218 (Del.2005) (explaining that advancement provisions promote the public policy of attracting the most capable people into corporate service).

**55.** As a final consideration, I note that if it were necessary to insist on giving some inde-

pendent meaning to the term "hold harmless" without importing an advancement right into it, it would be possible to do so. The terms "indemnify" and "hold harmless," while having similar, if not identical, meanings, are typically used in subtly different contexts. In the abstract, the word indemnify generally grants rights, and the phrase hold harmless generally limits liability. At least one treatise on the Delaware Limited Liability Company Act suggests that the use of the phrase "hold harmless" in the indemnification provision (§ 108) of that Act, works to permit an LLC Agreement to limit a manager's liability for breaches of fiduciary duty. *See* Wayne J. Carey & Ellisa Opstbaum Habbart, Delaware Limited Liability Company Forms and Practice Manual § 7.10 (2006) ("The indemnification provision in the Act, while unlike the provision in the DGCL which permits the elimination of di-

advancement rights, much like the public policy in favor of arbitration, "does not trump basic principles of contract interpretation," [56] and does not alter the fact that a limited liability company will only be obligated to advance litigation expenses to an officer when its LLC agreement expressly states the company's intention to mandate advancement.[57]

This court has already once implicitly rejected the argument that Majkowski makes in this case. In *Morgan v. Grace*,[58] without even suggesting the possibility that any ambiguity existed, Vice Chancellor Lamb held that an indemnification provision that required a limited liability company to "indemnify and save harmless" its members from certain losses did not require the company to advance any litigation expenses to its members. One would think that if the usually accepted meaning of the phrase "hold harmless" or "save harmless" included a right to advancement, or even if there was some ambiguity of meaning, that argument would have at least been raised in the *Morgan* case. It was not because the meaning is clear: "hold harmless" does not mean advancement.

## V. *Conclusion*

For the reasons stated above, American Imaging's motion to dismiss Majkowski's claim to advancement under the AIM LLC Agreements for failure to state a claim is

granted. Each side to bear its own costs. IT IS SO ORDERED.

rector liability in certain circumstances for violations of the duty of care, does permit the LLC to 'hold harmless' any member or manager or agent of the LLC 'from and against any and all claims and demands whatsoever.' This language, in conjunction with the ability to restrict the duties otherwise imposed on a member or manager, suggests the ability to prepare a limited liability company agreement that not only holds a manager or member harmless for breaches of the duty of care, as in the DGCL, but also for matters beyond the duty of care, such as breaches of the duty

of loyalty."). When read together, as they are used in the AIM LLC Agreements and American law traditionally, the two related terms impart, by a phrase, a singular right that entitles Majkowski to be made whole once it is determined that he has met the requisite good faith standard of conduct.

**56.** *Parfi*, 817 A.2d at 156.

**57.** *Advanced Mining Systems*, 623 A.2d at 84.

**58.** 2003 WL 22461916 (Del.Ch.2003).