# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| RICHARD BRODY, individually and as representative of Selling Shareholders, | ) ) ) |
| Plaintiff/Counterclaim-Defendant, | ) ) ) |
| v. | ) C.A. No. 2018-0507-LWW ) |
| DCIM SOLUTIONS, LLC, and IGEM COMMUNICATIONS HOLDING, INC., | ) ) ) ) |
| Defendants/Counterclaim-Plaintiffs. | ) ) |

## MEMORANDUM OPINION

Date Submitted: March 27, 2025
Date Decided: June 30, 2025

Gary W. Lipkin & Devan A. McCarrie, SAUL EWING LLP, Wilmington, Delaware; *Counsel for Plaintiff/Counterclaim-Defendant Richard Brody*

Paul D. Brown, Kelly E. Rose & Mariska Suparman, CHIPMAN, BROWN, CICERO & COLE, LLP, Wilmington, Delaware; *Counsel for Defendants/Counterclaim-Plaintiffs DCiM Solutions, LLC and iGEM Communications, Inc.*

**WILL, Vice Chancellor**

This case is about the 2016 sale of two companies the plaintiff owned. Neither the seller nor the buyers are content with the deal they struck, leading to seven years of fitful litigation. The plaintiff-seller insists that the buyers are wrongfully withholding payments on a promissory note after ending a post-closing adjustment process in bad faith. The defendant-buyers respond that they were defrauded over the seller's undisclosed tax liabilities and are entitled to indemnification.

After trial, I reach a mixed result. The buyers failed to prove fraud and can recover only the single tax liability they paid out of pocket. The seller showed that the buyers breached the parties' sale agreements by thwarting the post-closing audit process and is entitled to the balance of the note. Judgment is for the buyers in part, and for the seller in part.

## I.     BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.[1]

---

[1] Joint Pre-trial Stipulation and Order (Dkt. 270) ("PTO"). The trial record includes live testimony of three fact and two expert witnesses, 465 joint exhibits, and seven deposition transcripts. Trial testimony is cited as "[Name] Tr. __." *See* Trial Tr. Vols. I and II (Dkts. 275-76). Exhibits are cited by the numbers provided on the parties' joint exhibit list as "JX __," unless otherwise defined. *See* PTO Ex. A (Dkt. 259). Pincites refer to internal pagination or, if a document lacks internal pagination, by the last four digits of Bates stamps. Deposition transcripts are cited as "[Name] Dep. __."

1

## A. IIS and Velocity

Richard Brody is a successful businessperson who, after practicing as an attorney, ran his family business of operating vending machines in New York City and northern New Jersey.[2] In the mid-aughts, Brody invested capital in a technology business called IIS Group, LLC operated by an acquaintance, Anthony Jett.[3]

Brody became IIS's 90% owner and served as CEO and chair of its board.[4] Jett, who held the remaining 10% of IIS's equity, was the company's President and handled its day-to-day operations.[5] Jett's duties extended to financial matters, including the payment of operating expenses.[6] Jett reported to Brody, but Brody exercised indirect oversight and relied on financial and accounting reports prepared by Jett or IIS's CFO to gain visibility into the business.[7]

The initial concept for IIS was to provide virtual desktop services.[8] Over the years, Brody and Jett worked to expand the business through sales and acquisitions, including in the data center industry.[9] One of the companies that Brody and Jett

---

[2] Brody Tr. 7-9.

[3] *Id.* at 9-11; *see* Brody Dep. 11-12, 14-15; Jett Day 1 Dep. 9-11.

[4] Brody Tr. 13; PTO ¶ II.C.iii.

[5] Brody Tr. 11-12; PTO ¶¶ II.C.ii, iv.

[6] Brody Tr. 17-18.

[7] *Id.* at 12-13, 18-19.

[8] *Id.* at 10; *see* PTO ¶ II.C.i.

[9] Brody Tr. 14.

added to their portfolio was Velocity Network Communications, Inc., which provided Voice over Internet Protocol (VoIP) services.[10]

Brody had the same role at Velocity that he held at IIS. He owned 90% of Velocity's equity and was (either formally or informally) the CEO.[11] He reviewed Velocity's financial statements and oversaw its strategic direction.[12] Jett, who held the other 10% of Velocity's equity, ran the day-to-day business.[13] Employees reported to Jett, and Jett reported only to Brody.[14]

## B. The Companies' Taxes

As a telecommunications provider, Velocity was required by the Federal Communications Commission (FCC) to pay Federal Universal Service Fund (FUSF) fees.[15] Congress established the FUSF in the late 1990s to promote universal service in the telecommunications industry.[16] The administration of the FUSF is handled by the Universal Service Administrative Company (USAC).[17] The FCC allows carriers

---

[10] *Id.* at 14-15.

[11] *Id.* at 15-16, 64-65; Brody Dep. 24.

[12] Brody Tr. 63-65.

[13] *Id.* at 16.

[14] *Id.* at 65; Brody Dep. 23-24.

[15] Tipton Tr. 133-34; Brody Dep. 32-34; *see* PTO ¶ II.F.i.

[16] *See In the Matter of Rep. on the Future of the Universal Serv. Fund*, 37 F.C.C. Rcd. 10041, 10042-43 (2022). The FUSF is used to support the provision of telecom services to low-income customers and those living in high cost or rural areas. *Id.*; PTO ¶ II.F.ii.

[17] PTO ¶ II.F.iii.

like Velocity to recover FUSF fees by charging allocable shares of the fees to end consumers.[18]  Consumer fees are then recorded as current liabilities on the company's balance sheet until the USAC invoices are paid.[19]  If the company fails to pay its FUSF fees, those liabilities are submitted to the United States Treasury Department and become delinquent debts owed to the federal government.[20]

Unlike Velocity, IIS was not subject to FUSF fees.  It faced different tax complexities.  Because IIS sold its data center equipment and services throughout the country, it was responsible for registering to do business in multiple states and remitting state sales taxes.[21]

## C. The Sales to DCiM and iGEM

As IIS and Velocity grew, Brody became reluctant to continue infusing capital.[22]  In early 2016, Brody told Jett that he wanted to sell both IIS and Velocity (together, the "Sellers").[23]  Jett identified Ernest Cunningham as a prospective buyer.[24]

---

[18] Tipton Tr. 198-202 (comparing FUSF fees and sales taxes).

[19] *Id.*

[20] *Id.* at 135-36.

[21] Brody Dep. 105-06.

[22] Brody Tr. 39-40.

[23] *Id.* at 39; Brody Dep. 35.

[24] Brody Tr. 40; Brody Dep. 36-37.

4

Cunningham is the CEO and majority stockholder of iGEM Communication Holding, Inc., and holds an equity stake in DCiM Solutions, LLC (with iGEM, the "Buyers").[25] Both iGEM and DCiM are Texas corporations.[26] iGEM supplies voice, data, and mobile telecommunication services to multinational enterprises.[27] DCiM provided data center infrastructure optimization solutions and sold related equipment.[28]

In July 2016, Cunningham sent Jett an initial letter of intent for DCiM to purchase IIS and iGEM to purchase Velocity.[29] The LOI contemplated a combined $10 million purchase price.[30] It also confirmed that the parties would work toward a definitive agreement with "standard and customary" representations and warranties.[31]

Due diligence began in August 2016, with principals of both the Sellers and Buyers participating.[32] The Buyers engaged in several days of on-site due diligence

---

[25] Cunningham Dep. 6-7.

[26] PTO ¶¶ II.A.ii-iii.

[27] Tipton Tr. 133.

[28] McClain Dep. 168; Cunningham Dep. 9-10; McClain Tr. 290-91. DCiM ceased operations in August 2023. It has no cash and holds only *de minimis* assets on which its lender has a first position lien. *See* McClain Tr. 289.

[29] JX 199 (Letter of Intent from iGEM and DCiM) ("LOI"); PTO ¶ II.D.i.

[30] LOI ¶ 2; *see* Tipton Tr. 154.

[31] LOI ¶ 7; *see* Brody Tr. 71.

[32] Tipton Tr. 139; McClain Tr. 297.

at the Sellers' Fort Washington, Pennsylvania office.[33]  The Buyers were focused on 2016 financial information, including their balance sheets, to validate the Sellers' present value.[34]  During the process, the Buyers learned that the Sellers had certain tax liabilities: Velocity owed FUSF fees and IIS owed state sales taxes.[35]

iGEM's CFO James Tipton was tasked with assessing Velocity's then-current financial condition.[36]  About a month before closing, Tipton told Cunningham that he wanted to speak to the "[third] party who ha[d] been managing [Velocity's] taxes and completing [Form] 499s" but was "waiting to get USAC invoices before scheduling the call."[37]  Tipton also reviewed Velocity's balance sheet as of August 31, 2016, which listed outstanding USAC invoices.[38]  Four days before closing, Tipton emailed Jett and one of the Sellers' financial controllers, Stephen Hoffman, with "questions" on the August 2016 balance sheet—specifically, "why [Velocity was not] paying [its] USAC invoices . . . ."[39]  Jett responded that Velocity was "still waiting [on] credits from USAC," which would obviate the need for

---

[33] Tipton Tr. 139; *see* Jett Day 1 Dep. 146.

[34] *See* Tipton Tr. 237-39; McClain Tr. 358 (discussing narrow focus on 2016 financial information to validate the balance sheet); *see also* Tipton Dep. 23.

[35] Tipton Tr. 173, 238-39; *see also* JX 250.

[36] Tipton Dep. 22-23; Tipton Tr. 172-73.

[37] JX 216.

[38] Tipton Tr. 155; Tipton Dep. 40-42.

[39] JX 250; *see* Brody Tr. 24.

payments.[40]  There was no further discussion of Velocity's FUSF liabilities until after closing.

Michael McClain, the CEO of DCiM, ran diligence on IIS.[41]  Before closing, McClain discovered that IIS had sales tax liabilities in nine states.[42]  IIS had only disclosed to the Buyers sales tax liabilities owed to four states (those in which IIS had offices), totaling $185,000.[43]  The largest undisclosed liability McClain found was $110,000 due to the State of Illinois.[44]  McClain did not ask IIS about the discrepancies before closing.[45]

## D.     The MIPA and SPA

On September 30, 2016, DCiM executed a Membership Interest Purchase Agreement (the "MIPA") to acquire all of IIS's membership interests.[46]  Brody and Jett signed the MIPA as IIS's "Selling Members," and Brody signed as both IIS's

---

[40] JX 247; JX 328 at 1 (reflecting Brody's statement that "the expectation is the[] [invoices] will never be paid . . . [they] should get a working capital credit from a reduction in the Payables total"); *see* Tipton Tr. 244.

[41] McClain Dep. 8-9, 90.

[42] McClain Tr. 362; *see* McClain Dep. 122-23; JX 256.

[43] McClain Tr. 362; Thompson Tr. 440.

[44] JX 256.

[45] McClain Tr. 362.

[46] JX 266 (closing binder) Tab B.1. (IIS Membership Interest Purchase Agreement) ("MIPA").

representative and the "Selling Member Representative."[47] Simultaneously, iGEM executed a Share Purchase Agreement (the "SPA," and with the MIPA, the "Purchase Agreements") to acquire all of Velocity's issued and outstanding capital stock.[48] Brody and Jett signed the SPA as Velocity's "Selling Shareholders," and Brody signed as the representative of Velocity and the "Selling Shareholder Representative."[49]

The MIPA and SPA include identical representations and warranties by the Sellers for the benefit of the Buyers in Article VII.[50] Several are relevant here. Section 4.6(b) confirms that the Sellers' financial statements were "present[ed] fairly and accurately, in all material respects."[51] And Section 4.6(c) states that the Sellers have "no Liabilities other than [] obligations under contracts and commitments incurred in the ordinary course of business" or those "expressly incurred pursuant to [the Purchase] Agreement[s]."[52]

---

[47] MIPA '5548-49. Brody's signature line referred to him as the "President" of IIS. *Id.* at '5548. That seems to be an error. *See supra* notes 4-5 and accompanying text.

[48] JX 266 (closing binder) Tab A.1 (Velocity Network Communications, Inc. Share Purchase Agreement) ("SPA"); *see* PTO ¶ II.D.iv.

[49] SPA '5278-79.

[50] *See, e.g.*, SPA §§ 4.1(a), 4.6(b)-(c); MIPA §§ 4.1(a), 4.6(b)-(c). The SPA and MIPA are governed by Delaware law. SPA § 9.10; MIPA § 9.10.

[51] SPA § 4.6(b); MIPA § 4.6(b).

[52] SPA § 4.6(c); MIPA § 4.6(c). "Liabilities" is defined to include all manner of "debts, liabilities, commitments, losses, deficiencies, charges, claims, damages, demands, costs, fees, expenses and obligations . . . whether accrued or fixed, absolute or contingent, matured or unmatured, known or unknown, on- or off-balance sheet, including those

The Purchase Agreements also included tax-related representations. In Section 4.8(b)(i), the Sellers stated that they had "timely filed all required U.S. federal, state, local and non-U.S. [tax] returns" and "timely paid all material Taxes."[53] In Section 4.8(b)(iii), the Sellers represented that "[n]o deficiency for Taxes ha[d] been threatened, claimed, assessed or proposed . . . ."[54] And in Section 4.8(b)(viii), the Sellers confirmed that "[t]here [we]re (and immediately following the Closing Date there w[ould] be) no Liens on the assets of the [Seller]."[55] Section 6.5(e) provided a remedy by which Brody and Jett would indemnify the Buyers for any "loss, claim, liability, expense, penalty, or other damage attributable to" taxes during the pre-closing period.[56]

## E. The Note

Both transactions closed on September 30, 2016.[57] The total purchase price was $10 million. DCiM paid $3 million for IIS—$1 million in cash and a $2 million promissory note from DCiM payable to Brody (the "Note") that was guaranteed by

---

arising under any Contract, law, statute, ordinance, regulation, rule, code, common law or other requirement or rule enacted or promulgated by any Governmental Entity." SPA § 1.1; MIPA § 1.1.

[53] SPA § 4.8(b)(i); MIPA § 4.8(b)(i); *see infra* note 154 and accompanying text (discussing the definition of "Taxes" in the Purchase Agreements).

[54] SPA § 4.8(b)(iii); MIPA § 4.8(b)(iii).

[55] SPA § 4.8(b)(viii); MIPA § 4.8(b)(viii).

[56] SPA § 6.5(e); MIPA § 6.5(e).

[57] PTO ¶ II.D.iv; *see* JX 266.

iGEM.[58]  iGEM paid $7 million for Velocity—$4 million in cash and about $3 million in assumed bank debt.[59]

At closing, the Sellers received the cash consideration, but $2 million remained due on the Note.[60]  The Note was subject to post-closing adjustments based on revenue and working capital calculations.[61]  Under the Note, DCiM was obligated to make ten payments of $200,000 each (plus accrued interest) to Brody starting on March 31, 2017, with the last payment due on June 30, 2019 "at which time th[e] Note [would] mature . . . ."[62]  The Buyers assumed that the payments would be funded out of the acquired businesses' cash flows.[63]

---

[58] PTO ¶ II.D.iii; MIPA § 2.2; *see also* JX 266 (closing binder) Tab B.4 (Secured Subordinated Promissory Note) ("Note") '5567.

[59] PTO ¶ II.D.iv; *see* JX 266 (closing binder) Tab A.12 (Velocity Funds Flow Statement) '5875.

[60] Brody Tr. 43; Tipton Tr. 248-49.

[61] The EBITDA and revenue multiples are implied based on the transaction and documented in the LOI.  *See* Tipton Tr. 153-54; LOI 2.  The sale price for IIS was based on a 5x EBITDA multiple.  Thompson Tr. 405-06.  The sales price for Velocity was based on a 1.5x revenue multiple.  *Id.*

[62] Note § 1(a); *see* SPA sched. 1.1(ii) at '5281; MIPA sched. 1.1(ii) at '5551; *see also* MIPA 8 (defining "Scheduled Note Balance" as "the scheduled principal and accrued but unpaid interest expected to be outstanding under the Promissory Note set forth on Schedule 1.l(ii) prior to giving effect to any payments or reductions made thereunder in accordance with Article VII"); *see also infra* note 227-228 and accompanying text (outlining the Note payment schedule).

[63] Tipton Tr. 149.

10

## F. The Post-Closing Adjustment Process

The Purchase Agreements outlined a post-closing adjustment process, primarily for the parties to reach consensus on the closing working capital figures.[64] If the Sellers' businesses were underperforming relative to negotiated revenue and EBITDA targets, the Buyers would be entitled to a set-off on the Note.[65] If the parties could not resolve their dispute on post-closing working capital, the Purchase Agreements required that it be put before a designated outside auditor.[66]

On March 31, 2017, the Buyers gave the Sellers closing working capital, revenue run rate, and adjusted EBITDA calculations, as required by the Purchase Agreements.[67] The Buyers later made several indemnification demands.[68] DCiM sought indemnification for state taxes that were collected but not remitted by IIS;[69] iGEM sought indemnification for outstanding FUSF fees owed by Velocity.[70] The indemnification claims exceeded the balance of the Note.[71]

---

[64] SPA § 2.7; MIPA § 2.6.

[65] *See* Brody Tr. 46-47; McClain Tr. 302-03; *see also* SPA § 2.7(b); MIPA § 2.6(b).

[66] *See* SPA § 2.7(b); MIPA § 2.6(b).

[67] PTO ¶ II.E.ii.

[68] *See* Brody Tr. 101-04; McClain Tr. 295-96; Tipton Tr. 166; *see* JX 389; JX 390 (Officer's Certificate under MIPA § 7.6(b)); JX 392 (Officer's Certificate under SPA § 7.6(b)).

[69] McClain Tr. 295-96; JX 390; Tipton Tr. 166.

[70] JX 392 ¶ 1; Tipton Tr. 166.

[71] McClain Tr. 295-96.

Brody formally objected, triggering the audit process.[72]  The Purchase Agreements required that disputes over the closing working capital calculation be resolved by a neutral and independent auditor: Bee Bergvall & Co. (the "Auditor"), an accounting firm in Warrington, Pennsylvania.[73]  The Purchase Agreements described the parties' obligations in the audit process and the mandate of the Auditor.[74]  The Auditor's determination of closing working capital would be "final, conclusive, and binding."[75]

The parties engaged the Auditor on August 2, 2017.[76]  Its charge included determining the Sellers' final closing working capital, revenue run rate, and annualized EBITDA.[77]  The Auditor completed its review of Velocity's calculations on November 28 and determined that Velocity's closing working capital adjustment was $124,544 and that its annualized EBITDA was $249,407.[78]  An EBITDA figure

---

[72] JX 331 (IIS Objection Letter); JX 340 (Velocity Objection Letter); McClain Tr. 295-96, 340-41.

[73] PTO ¶ I.A.3; *see also* MIPA §§ 2.5(c), 2.6(b); SPA §§ 2.5(c), 2.7(b); *Our Team*, Bee Bergvall & Co. (last visited June 29, 2025), https://bbcocpa.com/our-team/.

[74] SPA § 2.5(c); MIPA § 2.5(c).

[75] SPA § 2.7(b) (stating that "the determination of the Auditor . . . shall be final, conclusive and binding on the Parties"); MIPA § 2.6(b) (same).

[76] *See* JX 352 (engagement letter).

[77] *See id.* at 2.

[78] JX 356 at 4-5.  The Auditor was engaged to issue a report on DCiM as well, but never issued it due to the subsequent disputes with iGEM.  *See* McClain Tr. 350; *infra* notes 212-18 and accompanying text.

12

over the SPA's $200,000 threshold meant that no closing adjustment would be made with respect to EBITDA—an outcome unfavorable to the Buyers.[79]

After reviewing the report, Tipton emailed the Auditor to raise perceived inaccuracies.[80] Tipton believed that if the Auditor's errors were corrected, it would "flip[] [EBITDA] below target" in the Buyers' favor.[81] The Auditor issued a revised calculation two days later, adjusting the final annualized EBITDA to $209,346.[82] The revised amount still exceeded the contractual threshold.

The Auditor declined to make further changes, stating that its report was "final once issued and binding to the parties."[83] But after Tipton threatened to bring a malpractice claim, the Auditor said that it would consider more arguments from iGEM if the parties signed revised engagement letters.[84] Brody agreed; DCiM and iGEM refused.[85]

No further work was completed by the Auditor, including the report on IIS.[86]

---

[79] *See* SPA § 2.7(b); Tipton Tr. 149.

[80] JX 358; JXs 360-61.

[81] JX 459; *see* JX 365.

[82] JX 359 at '199-204.

[83] JX 367.

[84] JX 404; JX 368 at 1; *see* JX 388; JXs 395-97; *see also* Brody Tr. 51-52.

[85] *See* JXs 405-06; JX 460; *see also* Brody Tr. 54; *infra* notes 212-14 and accompanying text.

[86] McClain Tr. 350.

## F.    This Litigation

The parties went on to engage in years of protracted litigation.

First, the Buyers attempted to engage in binding arbitration.[87] Before it got underway, in July 2018, Brody filed this suit against DCiM and iGEM.[88] The parties agreed to abandon arbitration in lieu of litigation and to defer the first two payments on the Note while the suit was pending.[89] DCiM and iGEM subsequently brought counterclaims against Brody and Jett.

Brody filed the operative amended complaint on November 19, 2021, advancing various claims under the Purchase Agreements against the Buyers.[90] The Buyers responded with counterclaims (some of which remain pending) and a third-party claim against Jett that was subsequently resolved.[91] Brody, in turn, filed a

---

[87] PTO ¶ I.B.8; *see* MIPA § 7.6; SPA § 7.6.

[88] Dkt. 1.

[89] *See* PTO ¶¶ I.B.8-9.

[90] Verified Am. Compl. (Dkt 147) ("Compl.").

[91] Def.-Countercl. Pl. DCiM Solutions, LLC's Answer to Am. Compl. with Countercls. (Dkt. 154) ("DCIM Countercls."); Def. and Countercl.-Pl. iGEM Communications Holding, Inc.'s Answer to Verified Am. Compl. with Verified Countercls. (Dkt. 155) ("iGEM Countercls.").

In 2019, the Buyers and Jett entered into settlement agreements that contained a series of statements accusing Brody of misconduct. *See* JX 408 § 1.13; JX 409 § 1.13. Jett was later deposed in this case, while he was no longer under the Buyers' employ. He recanted certain accusations against Brody in the settlement agreements. *See* Jett Day 1 Dep. 134-35, 155-56; Jett Day 2 Dep. 335-36, 341-42, 390-91. But Jett's deposition testimony was also internally inconsistent. *See* Jett Day 2 Dep. 335-36, 349. Given these contradictions, the statements in the settlement agreement and Jett's testimony are given little weight.

14

third-party claim against Jett that he subsequently voluntarily dismissed.[92]

Brody later sought partial summary judgment on his claim that the Buyers failed to place disputed funds in escrow. I granted summary judgment in his favor based on the plain terms of the Purchase Agreements.[93] Settlement talks ensued but failed.[94] The Buyers then abandoned their counterclaims against Brody for breaches of representations and warranties in the Purchase Agreements so that they were not obligated to escrow any funds.

At the time of trial, Brody's sole remaining claim is for breach of the Purchase Agreements and declaratory judgments about the failed audit process and payment of the Note.[95] The Buyers' only remaining counterclaims are against Brody for fraud regarding the Sellers' financial statements and tax-related representations and for breach of a tax indemnification provision in the Purchase Agreements.[96] Each party raises certain affirmative defenses.

---

[92] *See* Dkt. 177.

[93] *See* Dkts. 172, 175.

[94] Dkt. 189.

[95] *See* PTO ¶¶ III.A, IV.A.

[96] *See* PTO ¶ III.B, IV.B.

A two-day trial was held from October 30 to 31, 2024.[97] The parties filed opening post-trial briefs on February 20, 2025.[98] They completed post-trial briefing on March 19.[99] The matter was submitted for decision after post-trial argument on March 27.[100]

## II.    ANALYSIS

Brody and the Buyers spar over liability for two main issues: (1) the Sellers' outstanding tax liabilities at closing; and (2) the failed audit process.

The Buyers focus on the first issue, claiming that Brody made fraudulent statements in the Purchase Agreements and then the Sellers failed to uphold their tax indemnification obligations. They seek monetary damages to cover the Sellers' outstanding tax liabilities.

Brody focuses on the second issue, claiming that the Buyers breached the Purchase Agreements (or, alternatively, the implied covenant of good faith and fair dealing) by stalling and failing to complete the audit process. He asserts that the Buyers must pay him the full balance of the Note with interest.

---

[97] Dkt. 274; *see also* Dkts. 275-76.

[98] Pl. Countercl. Def. Richard Brody's Post-trial Br. (Dkt. 283) ("Brody's Opening Br."); Defs.' Post-trial B. (Dkt. 284) ("Buyers' Opening Br.").

[99] Pl. Countercl. Def. Richard Brody's Post-trial Answering Br. (Dkt. 289) ("Brody's Answering Br."); Defs.' Post-trial Answering Br. (Dkt. 290) ("Buyers' Answering Br.").

[100] Dkt. 293; *see* Tr. of Post-trial Oral Arg. (Dkt. 294) ("Post-trial Tr.").

Each side prevails, in part. The Buyers fail to show fraud but prove that Brody breached the tax indemnification obligations in the Purchase Agreements. They can recover one of the outstanding liabilities, however. Brody is entitled to a declaratory judgment that the Buyers breached the Purchase Agreements and must pay him the Note with interest.

## A. The Buyers' Counterclaims and Brody's Affirmative Defenses

The Buyers' claims against Brody center on his representations about the magnitude of FUSF fees owed by Velocity and outstanding state sales taxes owed by IIS. I begin by addressing their fraud claim on these issues before turning to their breach of warranty claim. I conclude by addressing Brody's equitable estoppel affirmative defense. The proponent of the claim or affirmative defense has the burden to prove it by a preponderance of the evidence.[101]

### 1. Fraud

A party advancing a common law fraud claim must prove five elements:

> (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or [made with] reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon

---

[101] *See e.g.*, *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *9 (Del. Ch. Oct. 30, 2015) ("Proof by a preponderance of the evidence means proof that something is more likely than not."); *In re Coverdale*, 1987 WL 758002, at *3 (Del. Ch. Aug. 3, 1987) ("The burden of proof in civil cases in Delaware is typically one of preponderance of the evidence . . . ." (citation omitted)).

the representation; and (5) causally related damages to the plaintiff.[102]

Each element must be proven by a preponderance of the evidence.[103] The fraud must be "material" and "concern an essential part of the transaction."[104]

The Buyers meet their burden on the first element, but they fail on the second. My analysis of their fraud claim ends there.

### a. False Representations

Under Delaware law, "fraud can occur [] in one of three ways: (1) an overt misrepresentation; (2) silence in the face of a duty to speak; or (3) active concealment of material facts."[105] "Fraud need not take the form of an overt misrepresentation; it also may occur through concealment of material facts, or by silence when there is a duty to speak."[106] "[A]lthough a statement or assertion may be facially true, it may constitute an actionable misrepresentation if it causes a false

---

[102] *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773 (Del. 2014).

[103] *NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *12 (Del. Ch. Aug. 2, 2023).

[104] *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *31 (Del. Ch. Apr. 03, 2020) (quoting *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *33 (Del. Ch. Dec. 3, 2018)).

[105] *In re Am. Int'l Grp., Inc., Consol. Deriv. Litig.*, 965 A.2d 763, 804 (Del. Ch. 2009), *aff'd sub nom. Tchrs.' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).

[106] *Paron Cap. Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *5 (Del. Ch. May 22, 2012), *aff'd*, 62 A.3d 1223 (Del. 2013) (quoting *Winner Acceptance Corp. v. Return on Capital Corp.*, 2008 WL 5352063, at *6 (Del. Ch. Dec. 23, 2008)).

impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief."[107]

The Buyers point to several statements in the Purchase Agreements that they contend are actionable misrepresentations. They include:

> (1) except as disclosed in the Sellers' financial statements, the Sellers had "no Liabilities other than . . . obligations under contracts and commitments incurred in the ordinary course of business, which, individually or in the aggregate, are not material to the financial condition or operating results of the [Sellers]";[108]
>
> (2) the Sellers had "timely filed all required U.S. federal, state, local and non-U.S. returns, estimates, information statements and reports (the 'Returns')" and "timely paid all material Taxes required to be paid by or with respect to it, whether or not shown on such Returns";[109]
>
> (3) the Sellers did not have "any liabilities for unpaid Taxes which had not been accrued or reserved on its Current Balance Sheet, whether asserted or unasserted, contingent or otherwise";[110]
>
> (4) "[n]o deficiency for Taxes has been threatened, claimed, assessed or proposed, in each case in writing, against the [Sellers]";[111]

---

[107] *Norton v. Poplos*, 443 A.2d 1, 5 (Del. 1982).

[108] MIPA § 4.6(c); SPA § 4.6(c); *see also* MIPA § 4.6(b)(iii) (representing that IIS's financials "present fairly and accurately, in all material respects, the financial condition and results of operations, as of the dates thereof or for the periods covered thereby"); SPA § 4.6(b)(iii) (same regarding Velocity's financials).

[109] MIPA § 4.8(b)(i); SPA § 4.8(b)(i).

[110] MIPA § 4.8(b)(v); SPA § 4.8(b)(v).

[111] MIPA § 4.8(b)(iii); SPA § 4.8(b)(iii).

(5)    the Sellers had "no Knowledge of any basis for the assertion of any claim relating or attributable to Taxes which, if adversely determined, would result in any Lien on the assets of the [Sellers]."[112]

These statements are false. The Sellers had tax liabilities that were material in the aggregate but undisclosed in the financial documents provided to the Buyers.[113] The Sellers had neither timely filed all tax returns nor paid all material taxes.[114] Existing tax liabilities risked liens on the Sellers' assets.[115]

### b.    Knowledge or Reckless Indifference

"After showing that a false representation was made, a plaintiff must show that the defendant had knowledge of the falsity of the representation or made the representation with reckless indifference to the truth."[116] The record here lacks any credible evidence that Brody knew his representations about the Sellers' financial status and outstanding tax liabilities were false when made. The Buyers thus focus

---

[112] MIPA § 4.8(b)(viii); SPA § 4.8(b)(viii).

[113] *See* Tipton Tr. 139-40, 175; McClain Tr. 305-09, 364; McClain Dep. 39.

[114] *See* Brody 99; Brody Dep. 59 ("My understanding is that there were some taxes that were not paid by the entity."); Tipton Tr. 174-75, 180-81, 188-89; McClain Tr. 306-07; JX 298; JXs 307-08; JX 310; JXs 312-15; JX 413.

[115] *See* Tipton Tr. 177-79; McClain Tr. 339.

[116] *Great Hill*, 2018 WL 6311829, at *32; *see also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004) (explaining that fraud "require[s] a certain level of scienter on the part of the defendant; a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth" (citation omitted)).

on whether Brody acted with reckless indifference to the veracity of the representations.

Recklessness is "conscious disregard for the truth" departing from the ordinary standard of care.[117] It involves "a conscious indifference to the decision's foreseeable results,"[118] but not "[a] deliberate state of mind."[119] A plaintiff may prove recklessness through circumstantial evidence, such as the timing of a misrepresentation.[120] Recklessness can also be inferred from misstatements about matters "so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant."[121] Still, "a mere allegation that a

---

[117] *Maverick*, 2020 WL 1655948, at *28; *see also Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009) (describing recklessness as "an extreme departure from the standards of ordinary care").

[118] *Wolf v. Magness Constr. Co.*, 1994 WL 728831, at *5 (Del. Ch. Dec. 20, 1994) (citation omitted).

[119] *Express Scripts, Inc. v. Bracket Hldgs. Corp.*, 248 A.3d 824, 834 (Del. 2021); *see also* Restatement (Third) of Torts: Liab. for Econ. Harm § 10(c) (Am. L. Inst. 2020) (noting that "'reckless' has a range of meanings in law" and that "[t]he recklessness sufficient to support a claim of fraud occurs when a speaker acts in conscious disregard of a risk that a statement is false, as by offering it without qualification while knowing that it may well be untrue").

[120] *See Deloitte*, 2009 WL 5200657, at *8; *see also id.* at *8 n.88.

[121] *NetApp*, 2023 WL 4925910, at *14 n.197 (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004)); *see also In re Oxford Health Plans Inc. Secs. Litig.*, 51 F. Supp. 2d 290, 295 (S.D.N.Y. 1999) (noting that recklessness could be inferred from "[a]n egregious refusal to see the obvious[] or to investigate the doubtful" (citation omitted)).

defendant 'knew or should have known' about a false statement is not sufficient to plead the requisite state of mind."[122]

The record lacks any evidence of a scheme to collect either sales taxes or FUSF fees without remittance or payment—much less that Brody was aware of any such scheme. Nor is there any evidence that state taxing authorities, the U.S. Treasury Department, the Sellers' employees, or the Sellers' customers alerted Brody to unpaid tax obligations. Instead, Brody credibly testified that he lacked firsthand knowledge of the sales and use taxes due at the time the Purchase Agreements were signed. Contrary to the Buyers' contentions, there is also no indication that Brody directed Jett to "massag[e] the numbers" before closing.[123]

The Buyers contend that Brody was reckless for four reasons. First, Brody confirmed that he signed the Purchase Agreements, affirmed the representations and warranties, and stood behind them.[124] Second, Brody understood the gravity of making representations and warranties in the Purchase Agreements and that the Buyers would be relying on them.[125] Third, despite these understandings, Brody took no affirmative steps to confirm that these representations and warranties were

---

[122] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *14 (Del. Ch. Nov. 19, 2013) (citation omitted).

[123] Buyers' Answering Br. 11.

[124] *See* Brody Tr. 81, 85-89.

[125] *See id.* at 89-90.

true.[126]    And fourth, Brody later acknowledged the shortcomings in the representations and warranties, stating that he would be more careful in the future.[127]

Taken together, these facts are insufficient to prove recklessness. As CEO, Brody was not expected to personally review the Sellers' tax bills and compare them to the Sellers' financial statements to make a representation and warranty on those issues. Brody instead relied in good faith on Jett, who ran the business; and on professional controllers and accounting personnel, who were charged with ensuring the accuracy and completeness of the Sellers' financial records.[128] Brody's reliance on his management team and accounting professionals is what one would expect of a CEO and part owner of a company. His reliance cuts against a finding of fraudulent intent.[129]

---

[126] *See id.* at 18, 77-78, 94-96.

[127] *See id.* at 96-97.

[128] *See id.* at 25-27 (Brody testifying that Jett and/or the Sellers' controllers would provide financial information to outside accountants for review); *id.* at 24-26, 30-33, 48-49 (Brody explaining that he relied on professionals to handle the Sellers' finances, including hiring an outside accounting firm to deal with USAC invoices).

[129] *See, e.g.*, *S.E.C. v. Johnson*, 174 Fed. Appx. 111, 115 (3d Cir. 2006) ("Good faith reliance on the advice of an accountant or another professional has been recognized as a viable defense to scienter in securities fraud cases."); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1243 (S.D. Cal. 2010) (concluding that a CEO lacked intent to defraud regarding statements about the truthfulness of financial statements where he had "no accounting education" and swore "that he relied in good faith on inside and outside professionals to produce accurate financial reports"); *Steed Fin. LDC v. Nomura Secs. Intern., Inc.*, 2004 WL 2072536, at *9 (S.D.N.Y. 2004) (explaining that a defendants' good faith reliance on professional experts cut against any finding of scienter to commit fraud).

A comparison to *NetApp v. Cinelli*, where a CEO was found liable for reckless misstatements about his company's finances in a merger agreement, reveals the weakness in the Buyers' case against Brody. In *NetApp*, the company had a practice of recording internal use of the company's own software as revenue in its financial statements.[130] The CEO was not only aware of the practice but also had personally mandated it.[131] The artificially inflated financial statements were later given to the acquirer in due diligence, and the target represented that the statements were accurate and GAAP compliant.[132] The CEO acknowledged that the internal billing practice was "artificial" and "lacked an accounting basis."[133]

Here, Brody was involved in the diligence process and occasionally oversaw high-level strategy for managing payables.[134] But there were no "warning signs."[135] Unlike in *NetApp*, no facts suggest that Brody was involved in the Sellers' tax practices or that he had reason to suspect the Sellers had outstanding tax liabilities.

---

[130] *NetApp*, 2023 WL 4925910, at *2-3.

[131] *Id.* at *14 (finding that the "[i]nternal [b]illing practice was implemented at [the CEO's] request").

[132] *Id.* at *6-7.

[133] *Id.* at *14 (cleaned up).

[134] *E.g.*, JX 206 (Brody telling Jett to "clean up" old USAC invoices); Jett Day 1 Dep. 152-55.

[135] *Metro Commc'n*, 854 A.2d at 147 (holding that a plaintiff failed to plead facts supporting an inference of recklessness because "there [wa]s no factual allegation indicating that [the] defendants consciously ignored specific warning signs").

Perhaps Brody could have asked more questions about the Sellers' financial practices and tax compliance.[136] But that is negligent conduct at most.[137] "Recklessness is more than 'inexcusable negligence.'"[138]

Because the Buyers have not proven that Brody recklessly made false statements in the Purchase Agreements, judgment is in Brody's favor on the Buyers' fraud counterclaim.

### 2. Breach of Tax Indemnification

The Buyers originally sought indemnification under Article VII of the Purchase Agreements for breaches of representations and warranties, in the alternative to their fraud counterclaim.[139] They voluntarily dismissed those breach of contract counterclaims after they were ordered to escrow the disputed funds as a

---

[136] *See* Brody Tr. 39 ("I was in the role of an investor. And if [Jett] said we had done the things that we needed to do and I didn't have any reason to question it – maybe I should have, but I didn't – then I would have signed it . . . ."); *id.* at 77-78 (testifying that he did not confirm whether USAC invoices were paid before closing); *supra* note 127 and accompanying text.

[137] To be clear, the Buyers have not proven that Brody was negligent.

[138] *NetApp*, 2023 WL 4925910, at *14 (quoting *In re Wayport, Inc. Litig.*, 76 A.3d 296, 326 (Del. Ch. 2013)).

[139] Those counterclaims involved the representations and warranties in Sections 4.6 and 4.8 of the Purchase Agreements discussed above. *See* DCiM Countercls. ¶¶ 75-80; iGEM Countercls. ¶¶ 102-07.

25

prerequisite to pursuing them. Now, they seek relief under a tax indemnification provision in Section 6.5 of the Purchase Agreements.[140]

To prevail on a breach of contract claim, a party must prove the existence of a contractual obligation, the breach of that obligation, and resulting damages.[141] "When interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, [the court is] constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended."[142] Of "paramount importance" is what "a reasonable person in the position of the parties would have thought the language of a contract means."[143] The court will "give priority to the parties' intentions as reflected in the four corners of the agreement" by construing the agreement as a whole and giving effect to all included provisions.[144]

---

[140] Buyers' Opening Br. 45-47; *see also* DCiM Countercls. ¶¶ 102-07; iGEM Countercls. ¶¶ 75-80.

[141] *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[142] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[143] *Id.* (citation omitted).

[144] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I,* 36 A.3d 776, 779 (Del. 2012).

a.    The Scope of Section 6.5(e)

The Buyers contend that Brody breached a duty in Section 6.5(e) of the Purchase Agreements to indemnify, defend, and hold them harmless for unpaid pre-closing tax liabilities.[145]  Section 6.5(e) states:

> The [Selling Shareholders or Selling Members] will, severally and not jointly, indemnify and defend the [Sellers], the [Buyers], and each Affiliate of the [Buyers], and hold them harmless from and against any loss, claim, liability, expense, penalty or other damage attributable to [] all Taxes (or the non-payment thereof) of each [Seller] for all Pre-Closing Tax Periods . . . .[146]

The Buyers believe that this provision imposes on Brody a broad duty to satisfy the Sellers' pre-closing tax liabilities, including IIS's unpaid sales taxes and Velocity's unpaid FUSF fees.  Section 6.5(e) was breached, they argue, because Brody has refused to satisfy this duty.

Brody does not dispute that he refused to indemnify the Buyers for the Sellers' pre-closing tax liabilities.  Instead, he insists that the Buyers are only entitled to seek indemnification for claims that tax authorities have formally pursued.  He points to Section 6.5(d) of the Purchase Agreements, which outlines a process to handle "notice of a *claim* by any Taxing authority that, if successful, could reasonably be expected to result in an indemnity payment . . . ."[147]  Applying that narrow limit to

---

[145] Buyers' Opening Br. 45-46.

[146] MIPA § 6.5(e); SPA § 6.5(e).

[147] MIPA § 6.5(d); SPA § 6.5(d) (emphasis added).

27

Section 6.5(e), Brody asserts that the Buyers have identified just one indemnifiable claim.[148]

Yet nothing in the Purchase Agreements suggests that the process to respond to tax "claims" in Section 6.5(d) limits the tax indemnification remedy in Section 6.5(e). Nor does Section 6.5(e) state that a "claim" is necessary to trigger the Sellers' duty to "indemnify," "defend," and "hold . . . harmless."[149] To limit Section 6.5(e)'s reach to "claims" would render the other terms in the phrase "any loss, claim, liability, expense, penalty, or other damage" superfluous.[150]

For example, Section 6.5(e) applies to a "liability," which does not require a formal claim. Black's Law Dictionary defines "liability" as "[t]he quality, state, or condition of being legally obligated or accountable" or "[a] financial or pecuniary obligation in a specified amount."[151] A tax liability exists when taxes are owed to the government.[152] Brody's narrow reading is thus unsupported by the terms of Section 6.5(e).

---

[148] Brody's Opening Br. 40-41.

[149] MIPA § 6.5(e); SPA § 6.5(e).

[150] *Id.*; *see Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 (Del. 2019) ("The contract must . . . be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term 'mere surplusage.'" (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010))).

[151] "Liability," Black's Law Dictionary (12th ed. 2024).

[152] *See Understanding Taxes: Glossary*, Internal Revenue Service, https://apps.irs.gov/app/understandingTaxes/teacher/glossary.jsp (last visited June 29, 2025) (defining "tax liability" as "[t]he amount of tax that must be paid"); *Tax Liability:*

28

Brody next argues that Velocity's past-due FUSF fees are not taxes for purposes of Section 6.5(e).[153]  Once again, this argument is inconsistent with the terms of the Purchase Agreements.  Section 6.5(e) uses the term "Taxes," which is defined in the Purchase Agreements as:

> any and all U.S. federal, state, local and non-US. taxes, including taxes based upon or measured by gross receipts, income, profits, sales, use and occupation, value added, ad valorem, transfer, franchise, withholding, payroll, recapture, employment, social security (or similar), unemployment, disability, excise and property taxes, assessments and *other governmental charges, duties, impositions and liabilities in the nature of a tax*, together with *all interest, penalties and additions* imposed with respect to such amounts . . . ."[154]

This unambiguous definition encompasses FUSF fees, which constitute "government charges . . . in the nature of a tax"  along with "penalties."[155]

---

*Definition,          Calculation,          and          Example*,          Investopedia, https://www.investopedia.com/terms/t/taxliability.asp  (last  updated  May  26,  2025) (describing a tax liability as an amount "owed to the government in taxes" and explaining that one has a liability when income is earned or profits are generated).

[153] Brody's Opening Br. 45 n.18.

[154] MIPA § 4.8(a); SPA § 4.8(a) (emphasis added).

[155] *See Rindahl v. Oliver*, 2020 WL 5901693, at *2 (E.D. Va. Mar. 20, 2020) (describing FUSF fees as a "'FUSF' tax").

In July 2024, the United States Court of Appeals for the Fifth Circuit ruled that the FCC's FUSF scheme violates the nondelegation doctrine by assigning its taxing power to private entities.  *See Consumers' Rsch. v. Fed. Commc'ns Comm'n*, 109 F.4th 743, 748 (5th Cir. 2024), *cert. granted sub nom. Sch., Health & Librs. Broadband Coal. v. Consumers' Rsch*., 45 S. Ct. 587 (2024).  The Supreme Court granted certiorari on the matter and oral argument was presented on March 26, 2025. *Consumers' Rsch.*, 145 S. Ct. 587.  It seems unlikely that the Supreme Court's pending decision on whether FUSF fees

b.     Damages

Although Section 6.5(e) is broad enough to encompass tax liabilities and outstanding FUSF fees, the Buyers cannot presently recover damages for much of what they seek.  "[I]ndemnity is an obligation by one party to make another whole for a loss that the other party has incurred."[156]  The point of indemnification is "repaying a loss to make the indemnitee whole."[157]  The "paradigmatic example" of an indemnity obligation is to reimburse an indemnitee who has paid a third party "a sum certain."[158]

There is only one sum certain here: the $49,289.52 in taxes, interest, and penalties that DCiM paid to the State of Washington.[159]  Had the Buyers paid other tax obligations that the Sellers owed pre-closing, Section 6.5(e) would have provided them recourse.  They chose not to pay the tax bills for the companies they had

---

are an extension of the FCC's taxing power will bear on the issues in this case, which concern the payment of FUSF fees previously owed.

[156] *Christiana Care Health Servs. Inc. v. Carter*, 223 A.3d 428, 431 n.7 (Del. 2019) (quoting 41 Am. Jur. 2d Indemnity § 1 (2025)).

[157] *Hill v. LW Buyer, LLC*, 2019 WL 3492165, at *10 (Del. Ch. July 31, 2019).

[158] *Levy v. Hayes Lemmerz Int'l, Inc.*, 2006 WL 985361, at *11 (Del. Ch. Apr. 5, 2006).

[159] McClain Tr. 363-64; JX 419 (letter to IIS dated June 4, 2020); JX 435.  Brody does not refute that DCiM paid the State of Washington approximately $50,000.  *See* Brody's Opening Br. 39-40.

purchased, but to wait for a damages award years later after interest and penalties accrued.[160]

The Buyers insist they are entitled to more because Section 6.5(e) imposes a duty to "defend" and "hold harmless."[161] Neither term supports what the Buyers seek, which is essentially advancement of tax liabilities.

Delaware courts decline to give separate meanings to "indemnify" and "hold harmless," viewing them as "an example of the law's hoary tradition of deploying joint terms . . . where technically one term would suffice."[162] "'[H]old harmless' does not mean advancement," because when one is indemnified for "all out of pocket expenses," she is "left free from harm" and "made whole."[163] As to "defend," it is understood in this context to create a right to advancement of litigation expenses.[164]

---

[160] Brody argues that the Buyers failed to mitigate their damages by refusing to pay the outstanding tax balances. *See* Brody's Opening Br. 49-50. Because I find that the Buyers are not entitled to indemnification for the unpaid balances that they may well never pay, I need not address Brody's mitigation argument.

[161] *See* Buyers' Opening Br. 46 ("The duty to defend has been found by Delaware courts to be independent of and broader than the duty to indemnify.").

[162] *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 106 A.3d 992, 1024-25 (Del. 2013); *see also Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 588 (Del. Ch. 2006) (noting that "[t]he terms 'indemnify' and 'hold harmless' have a long history of joint use throughout the lexicon of Anglo–American legal practice").

[163] *Majkowski*, 913 A.2d at 591.

[164] *Fillip v. Centerstone Linen Servs., LLC*, 2013 WL 6671663, at *6 (Del. Ch. Dec. 3, 2013) ("[T]he reference to [the] duty to 'defend' managers and officers created a mandatory right to advancement of litigation expenses."); *see also Majkowski*, 913 A.2d at 589 n.39 ("[T]he obligation to 'defend' comes closer to suggesting the active employment of attorneys and continual payment as the attorneys' fees are incurred.").

The Buyers are not embroiled in any active dispute for which they ask Brody to defend them. They are asking Brody to front the payment of liabilities that are now many years stale.

Even if Section 6.5(e) contemplated the sort of tax advancement right that the Buyers envision (it does not), they have failed to prove their damages with any "reasonable certainty."[165] To show their losses, the Buyers rely on their proffered expert, Joseph W. Thompson.[166] Thompson prepared calculations designed to estimate the tax burdens that could be borne by the Buyers. But he lacked the documentary invoices necessary to determine the principal, interest, and penalties assessed by the relevant tax authorities.[167] Without that data, he could only speculate about the sums past due.[168]

---

[165] *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015); *see id.* at 1151 n.87 ("The law requires that this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference." (citing 5 Corbin on Contracts § 1022 (rev. ed. 1964))).

[166] *See* JX 433 ("Thompson Rep."). Thompson is a Certified Financial Analyst and an Accredited Senior Appraiser who is currently a Principal at The Griffing Group. *Id.* at App'x B.

[167] Thompson Tr. 408-09, 421-22.

[168] *Id.* at 422 (Thompson: "I'm speculating, but the math makes sense."); *id.* at 404-06 (describing his approach to determining the Sellers' valuations and the debt owed); *see also* Pina Tr. 458 (Brody's rebuttal expert: "I believe a component of their damages related to taking . . . was essentially a forecast or speculation on what actual data was available for analysis."); *id.* at 498-99 ("They're asking for a damage [sic] of 150 round dollars, but there's nothing that you can tick and tie back to . . . support those numbers.").

For the FUSF fees owed by Velocity, Thompson approximated the total by calling the U.S. Treasury Department.[169] According to Thompson, a Treasury representative referred to only as "Kevin" relayed over the phone that Velocity owed over $408,000.[170] Kevin purportedly declined to provide documentation of that figure.[171] As an evidentiary matter, this hearsay is poor support for a nearly half-a-million dollar liability. I give it no weight.[172]

The documentary evidence is also problematic. Three weeks before trial—and three years after the deadline for document production—the Buyers produced documents purportedly showing Velocity's FUSF-related liabilities.[173] Four sets of documents contain account statements sent by the U.S. Treasury to Velocity for overdue FUSF charges.[174] The statements are all dated September 30, 2024 and list

---

[169] Thompson Tr. 406-07.

[170] Thompson Rep. 24-25; *id.* at 25 n.70 (citing a "nearly two-hour call with 'Kevin' from the U.S. Treasury, conducted on April 25, 2024" as the sole source for this figure); *see* Thompson Tr. 420. Thompson believes that Kevin is an account representative. Thompson Dep. 27.

[171] Thompson Tr. 407.

[172] Before trial, Brody filed a motion in limine to exclude evidence from the call with Kevin. Dkt. 246; Dkt. 273 at 35. After hearing the testimony from Tipton and Thompson about the call, I conclude that it is not entitled to evidentiary weight.

[173] *See* Dkt. 265; *see also* Dkts. 272-73.

[174] JXs 461-64.

liabilities totaling approximately $420,179.42.[175]   The other set of documents contains correspondence from a third-party debt collector dated September 10 and 27, 2024, seeking payment of $2,115.70.[176]

The documents provide few answers but raise additional questions.  The U.S. Treasury account statements concern "different debts" and cannot be tied to specific USAC invoices.[177]  Some of the statements use "agency debt numbers" and case numbers that follow no consistent format, making it impossible to determine when certain debts originated or whether they concern an actual obligation of Velocity.[178] Without invoice-level documentation, I have no reliable way to reconcile or verify what Velocity owed pre-closing.[179]  Neither party's expert had occasion to review these documents or incorporate them into their reports.

At trial, Thompson ballparked that, based on the $408,079.23 figure from Kevin in April 2024, Velocity was responsible for between $200,000 and $300,000 in FUSF liabilities at the time of closing—inclusive of interest, penalties, and

---

[175] Tipton testified that the documents have the same date because the U.S. Treasury representative he spoke to "regenerated" the documents while he was on hold during a phone call.  Tipton Tr. 187.

[176] JX 465.

[177] Thompson Tr. 424; *see id.* at 421.

[178] *See* Tipton 272-74; *see, e.g.*, JX 464 at '5267.

[179] *See* Thompson Tr. 421-22; Tipton Tr. 192-93.

third-party fees.[180]  He acknowledges, though, that he lacks the records to confirm these amounts.[181]

Regarding IIS, Thompson identified $520,420 of principal owed for sales and use taxes.[182]  He explained that the sums were identified through a "bottom-up approach" by looking at IIS's general ledger and certain invoices.[183]  He estimated another $150,000 in fees and additional costs but acknowledged that he lacked the documentation to confirm that figure.[184]

Even if there were responsible evidentiary bases from which to estimate IIS and Velocity's tax and FUSF liabilities before closing (there is not), the record suggests that an award of all outstanding tax liabilities is unwarranted.  The Buyers have suffered no actual loss—save the $49,289.52 paid to Washington.[185]  Critically, the record suggests that the other liabilities will *never* be paid.  The U.S. Treasury statements concern an account held by Velocity that iGEM no longer uses.[186]  And

---

[180] Thompson Tr. 402, 408; Thompson Rep. 24-25.

[181] Thompson. Tr. 408.

[182] Thompson Rep. 3, 29-30; *see* Thompson Tr. 412.

[183] Thompson Tr. 412-13.

[184] Thompson Rep. 30-31; *see* Thompson Tr. 415 (explaining that he used the State of Washington's approach as a proxy).

[185] JX 419; JX 435.

[186] Tipton Tr. 179-80.

as for IIS's state taxes, DCiM has no intention of paying them; it is defunct.[187]

Indemnification is meant to make the indemnitee whole, not to provide a windfall to the indemnitee or serve as a penalty to the indemnitor.[188]

### 3. Brody's Affirmative Defenses

Brody asserts that the Buyers are entitled to no recovery for two reasons. First, he accuses the Buyers of material breaches of the audit process outlined in the Purchase Agreements.[189] I address that argument below in the context of Brody's affirmative breach of contract claim.[190] Second, he argues that the doctrine of unclean hands applies—also due to the Buyers' abandonment of the contractual audit process. Both defenses fail.

The doctrine of unclean hands "protect[s] the public and the court against misuse by one who, because of his conduct, has forfeited his right to have the court consider his claims, regardless of their merit."[191] "[I]n order for the doctrine to apply

---

[187] McClain Tr. 373-74; McClain Dep. 106-07; *see supra* note 28.

[188] *See Hill*, 2019 WL 3492165, at *10 ("[The] [b]uyer could seek indemnification—and reap a windfall—for speculative [l]osses that it never actually suffered. Such a payment would be antithetical to the concept of indemnification . . . ."); *see also Horton v. Organogenesis Inc.*, 2019 WL 3284737, at *4 (Del. Ch. July 22, 2019) ("[T]he purpose of the [m]erger [a]greement's indemnification provisions" is "to indemnify and hold harmless the indemnitee from and against [l]osses incurred"); *supra* notes 156-158 and accompanying text.

[189] Brody's Opening Br. 53-54.

[190] *See infra* note 222.

[191] *Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976).

36

in the first place, the improper conduct must relate directly to the underlying litigation."[192]  The relation must be "'immediate and necessary' . . . to the claims for which the plaintiff seeks relief."[193]

Brody cites no direct relationship between his refusal to provide tax indemnification and the Buyers' failure to complete the contractual audit process. He argues only that the Buyers "should not be permitted to reject certain portions of the SPA and MIPA, while wielding others."[194]  This link is too tenuous.  I decline to apply the doctrine to bar the Buyers from recovering for the limited damages they proved.[195]

## B.      Brody's Claims and the Buyers' Affirmative Defense

Brody seeks a declaratory judgment that the Buyers failed to cooperate in the audit process mandated by the Purchase Agreements.  He asserts that the Purchase Agreements were breached when the Buyers interfered with the audit and refused to sign a new engagement letter with the Auditor.[196]  In the alternative, Brody claims

---

[192] *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 523 (Del. Ch. 1998).

[193] *Macrophage Therapeutics, Inc. v. Goldberg*, 2021 WL 2582967, at *16 (Del. Ch. June 23, 2021) (citation omitted).

[194] Brody's Opening Br. 55.

[195] *See RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 876 (Del. 2015) (explaining that "whether to apply the doctrine of unclean hands" is a matter of the court's discretion) (citation omitted).

[196] Brody's Opening Br. 51-52.

that the Buyers breached the implied covenant of good faith and fair dealing by "threatening the Audit with malpractice and then refusing to sign" a revised engagement letter.[197] Brody also insists that the Buyers are in default on the Note, which is "immediately due and payable."[198] In response to these claims, the Buyers advance an equitable estoppel defense.

Brody prevails on his breach of contract claim because the Buyers breached their obligations regarding the audit process. They also are in breach of their obligation to pay Brody the principal and balance due on the Note. The Buyers' equitable estoppel defense gives them no recourse.

### 1. Breach of the Audit Process[199]

Under the Purchase Agreements, if the parties could not resolve a disagreement over the closing working capital calculation, the Auditor would "resolve any remaining disagreements."[200] The parties were to "use their respective commercially reasonable efforts to cause the Auditor to determine as promptly as practicable" any working capital adjustments.[201] They were also required to

---

[197] *Id.* at 52-53.

[198] *Id.* at 55.

[199] *See supra* note 144 and accompanying text (listing the elements for a breach of contract claim and applicable principles of contract interpretation).

[200] MIPA § 2.5(c); SPA § 2.5(c).

[201] *Id.*

"cooperate with the Auditor in its determination of such disputed amounts . . . ."[202] The parties agreed to treat the Auditor's determination of closing working capital as "final, conclusive, and binding."[203]

The Auditor's November 28, 2017 "final report" for Velocity was improper because its "decision for each disputed amount" was not "within the range of values ascribed to each item" by the parties, as the Purchase Agreements required.[204] When Tipton raised questions, the Auditor explained that, after adjusting certain disputed items within the limits of values the parties ascribed, "[t]he financial outcome to both parties remain[ed] the same . . . ."[205] Tipton then sent more information to the Auditor that he believed was needed to make the report "accurate."[206]

---

[202] *Id.* The full text of this term states:

> The Parties shall cooperate with the Auditor in its determination of such disputed amounts or changes and shall be entitled to address the Auditor in order to present any facts and arguments that such Party deems relevant to the Auditor's determinations and conclusions regarding the disputed amounts subject to review . . . .

*Id.*

[203] SPA § 2.7(b) (stating that "the determination of the Auditor . . . shall be final, conclusive and binding on the Parties."); MIPA § 2.6(b) (same).

[204] MIPA § 2.5(c); SPA § 2.5(c) ("The Auditor shall only decide the specific items under dispute by the Parties and its decision for each disputed amount must be within the range of values ascribed to each such item by the Purchaser and the Selling Shareholder Representative."); *see* Tipton Tr. 218-21; JX 359 at '0201-02.

[205] JX 359 at '0201 (providing revised calculations for adjusted EBITDA); *see also* JX 361 at '0297; Tipton Dep. 84-89.

[206] JX 359 at '0199.

The next day, Tipton berated the Auditor, insisting that its "report [wa]s WRONG."[207] He told the Auditor that he "suspect[ed] its professional liability carrier would [not] appreciate [the Auditor] insisting an obvious and admitted inaccurate work product [wa]s final."[208] Internally, Tipton told McClain and Cunningham that they were "at [a] point where EBITDA goes from being in [the] [S]ellers['] favor to being in [the Buyers'] favor," giving them a potential "recovery."[209] He said that if the Auditor was "thinking [the Buyers] [we]re less likely to make a claim on their professional liability coverage than [Brody,] [t]hey [we]re wrong. 😊"[210] In response, Cunningham suggested that they "try to get ahead of what [the Auditor] may render for [McClain] on the IIS side."[211]

The Auditor expressed its willingness to consider other arguments from iGEM, so long as the parties signed revised engagement letters with indemnification

---

[207] JX 371 at '0214; *see also* Tipton Dep. 88-93; McClain Dep. 137-38.

[208] JX 368; *see also* Brody Tr. 51-52.

[209] JX 287.

[210] *Id.*

[211] *Id.*

provisions and additional retainers.[212]  Brody consented;[213] the Buyers refused.[214]

The Buyers insisted that the Auditor commit to certain "definitions, language and processes" upfront, which the Auditor viewed as a "full scale re[-]write of the agreement" that risked imposing "undue influence" on it.[215]

McClain suggested to Cunningham and Tipton that the Buyers "push to terminate [the Auditor] and move forward against [the] Seller[s]."[216]  McClain and Tipton considered letting the Auditor "keep [its] fees" and "hold [a] liability claim over their head" to maintain "leverage" against Brody.[217]  Tipton agreed, writing that "nothing would make [him] happier than to hand deliver the professional liability claim to [the Auditor]. 😊"[218]  By March 2018, the audit process had ceased.

These actions by the principals of the Buyers breached Section 2.5(c) of the Purchase Agreements.[219]   First, iGEM refused to treat the Auditor's report for

---

[212] JX 371 ("We are happy to revisit any of your points, but not without written consent by both parties.  If you wish us to re-open, you will need Richard Brody to agree as well.  If both parties are in agreement, we will draft a separate engagement letter."); *see also* Brody Tr. 54; JX 460 at '6741-42; JX 384 at '6409-11.

[213] Brody Tr. 54; *see* JX 384 at '6407.

[214] *See* JXs 404-05; JX 460 at '6739; JX 384; JX 380.

[215] JX 384 at '6404, '6408; *see* JX 380.

[216] JX 405 at '6900.

[217] JX 404 at '6887.

[218] *Id.*

[219] Brody advances an implied covenant claim, in the alternative, for DCiM's and iGEM's misconduct regarding the audit process.  Because I conclude that express terms of the Purchase Agreements were breached, there are no grounds to consider this alternate theory.

Velocity as final. When the Auditor tried to work with iGEM, iGEM threatened a professional liability claim rather than cooperate with the Auditor. As for DCIM, it did not employ commercially reasonable efforts for the Auditor to reach a determination for IIS. The Buyers were more concerned with positioning themselves for litigation. Both seemed determined to reject any result that did not support a post-closing adjustment in their favors.

The Buyers contend that the audit process "failed" when new tax liabilities were discovered because the Purchase Agreements did not address later-discovered discrepancies.[220] They argue that the audit process provided only a narrow mechanism, unrelated to the fraud and contractual breaches they insist were suffered.[221] But the Buyers could have pursued their fraud and indemnification claims irrespective of the audit's outcome. The Purchase Agreements mandated that they complete the audit process through cooperation and commercially reasonable efforts.[222] They failed to uphold that promise.

---

*See Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) (explaining that an "implied covenant analysis will only be applied when the contract is truly silent with respect to the matter at hand"). Brody is entitled to one recovery. *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1277 (Del. 2021) (describing the double recovery rule).

[220] Buyers' Opening Br. 51.

[221] *Id.* at 50-51.

[222] Brody argues that the Buyers should not obtain any recovery under the tax indemnification provision in Section 6.5(e) because they breached the audit process. *See* Brody's Opening Br. 53-54. But unless the breach "go[es] to the substance of the contract,"

## 2. Failure to Pay the Note

Brody also claims that the Buyers forfeited any right to obtain an adjustment on the Note due to their refusal to cooperate in the audit process.[223] He seeks a declaration that the Note is due and payable to him immediately.[224]

The original value of the Note was $2 million, which formed part of the total purchase price for the Sellers' businesses.[225] The Note was promised by DCiM for

---

it will not permit the nonbreaching party to evade performance. *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *10 (Del. Ch. July 24, 2013) ("A slight breach of contract by one party, while giving rise to an action for damages, will not necessarily terminate the obligations of the injured party to perform under the contract."), *aff'd sub nom. Preferred Inv. Servs., Inc. v. T & H Bail Bond, Inc.*, 108 A.3d 1225 (Del. 2015); *see also BioLife Sols., Inc. v. Endocare, Inc*., 838 A.2d 268, 278 (Del. Ch. 2003) ("The question whether the breach is of sufficient importance to justify non-performance by the non-breaching party is one of degree." (citation omitted)). The Buyers' noncompliance with the audit process is distinct from their tax indemnification right.

Brody cites several cases where the failure to follow contractually-mandated dispute resolution procedures constituted a material breach. But those cases concern disputes or claims that were never submitted to the applicable mandatory pre-suit dispute resolution procedures in the first place. *See Lennox Indus. Inc. v. All. Compressors LLC*, 2020 WL 4596840, at *4 (Del. Super. Aug. 10, 2020); *Fernstrom v. Trunzo*, 2017 WL 6028871, at *4 (Del. Ch. Dec. 5, 2017), *aff'd sub nom. Fernstrom v. Ellis Point Condo. Ass'n, Inc.*, 198 A.3d 178 (Del. 2018); *Millsboro Fire Co. v. Constr. Mgmt. Serv., Inc.*, 2009 WL 846614, at *4 (Del. Super. Mar. 31, 2009); *Commonwealth Const. Co. v. Cornerstone Fellowship Baptist Church, Inc*., 2006 WL 2567916, at *15 (Del. Super. Aug. 31, 2006).

[223] Brody's Opening Br. 55-56.

[224] *Id.*; *see* Compl. ¶ 50.

[225] *See* MIPA 3 (defining "Aggregate Purchase Price"); SPA 2 (same); SPA § 2.2.

its purchase of IIS and guaranteed by iGEM under a Guarantee Agreement.[226] The Note was to be:

> paid in up to ten (10) equal payments of principal in the amount of Two Hundred Thousand Dollars ($200,000) each, plus accrued but unpaid interest, commencing on March 31, 2017 and continuing thereafter on the last day of each succeeding calendar quarter thereafter with the final installment to be made on June 30, 2019, at which time this Note shall mature and all unpaid principal and interest hereunder shall be due and payable in full.[227]

Schedule 1.1(ii) to the SPA outlined the payment schedule for the Note:[228]

| Subordinated Note | | |
|---|---|---|
| **Payment Date** | **Payment*** | **Principal Balance After Payment*** |
| 10/1/16 | | $2,000,000 |
| 3/31/17 | $(200,000) | $1,800,000 |
| 6/30/17 | $(200,000) | $1,600,000 |
| 9/30/17 | $(200,000) | $1,400,000 |
| 12/31/17 | $(200,000) | $1,200,000 |
| 3/31/18 | $(200,000) | $1,000,000 |
| 6/30/18 | $(200,000) | $800,000 |
| 9/30/18 | $(200,000) | $600,000 |
| 12/31/18 | $(200,000) | $400,000 |
| 3/31/19 | $(200,000) | $200,000 |
| 6/30/19 | $(200,000) | $0.00 |
| * plus interest | | |

---

[226] *See* MIPA 5 (defining "Guaranty Agreement"); *id.* at 7 (defining "Promissory Note").

[227] Note § 1(a). The Note is governed by Delaware law. *Id.* § 11.

[228] SPA sched. 1.1(ii) at '5281; MIPA sched. 1.1(ii) at '5551; *see also* MIPA 8 (defining "Scheduled Note Balance" as "the scheduled principal and accrued but unpaid interest expected to be outstanding under the Promissory Note set forth on Schedule 1.l(ii) prior to giving effect to any payments or reductions made thereunder in accordance with Article VII").

44

Under the Note, the unpaid principal would accrue interest at the "prime rate of U.S. commercial banks as published in The Wall Street Journal . . . calculated on each payment date with respect [to] the portion of the [p]rincipal [b]alance being repaid."[229] If there were an "Event of Default," that interest rate would be "increased by five percent."[230]

The Purchase Agreements and Note's terms contemplated certain setoffs and adjustments to the Note balance. If the Sellers were entitled to indemnification under Article VII of the Purchase Agreements, the Buyers would "have a right of off-set against the [] Note for any amounts payable to them."[231] The Note was also subject to "adjustments required pursuant to Section 2.5 of the [] Purchase Agreements" upon the completion of the audit process.[232] DCiM would be in default if it failed to

---

[229] Note § 1(c).

[230] *Id.* § 1(d).

[231] SPA § 7.4(c); *see id.* § 7.6(a); MIPA § 7.6(a); Note § 2 ("Subject to the limitations set forth in the [] Purchase Agreements, [DCiM] shall be entitled to (i) set-off and reduce any amount due and/or payable hereunder in the event of an indemnification claim under the [] Purchase Agreements (a 'Liability Claim') by DCiM or iGEM . . . ."). DCiM could also make payments to iGEM if iGEM claimed indemnification under Article VII of the Purchase Agreements. Note § 2. Section 6.5(f) of the Purchase Agreements also contemplate that payments under Article VI could reduce any payments owed to the Selling Members/Selling Shareholders. SPA § 6.5(f); MIPA § 6.5(f); *see infra* note 234 (discussing these provisions).

[232] Note § 2; *see* MIPA § 2.5(c) (stating that upon the "Determination Date"—i.e., the "date on which Final Closing Working Capital" was "finally determined" under Section 2.5(c) by the Auditor—certain shortfalls could be deducted "directly from the Note Balance").

make a payment to Brody subject to these provisions within 15 business days of receiving a "receipt of written notice of such failure to pay."[233]

Neither DCiM (the borrower) nor iGEM (the guarantor) has ever made a payment to Brody under the Note. The two issues that arguably gave them latitude to withhold payment—post-closing working capital adjustments by the Auditor and indemnification claims under Article VII of the Purchase Agreements—fell away. The potential for a reduction under Section 2.5(c) of the Purchase Agreements ended when the Buyers refused to cooperate in completing the audit process. And the possibility of a set-off for indemnification was eliminated when, in August 2023, the Buyers voluntarily dismissed their claims for breaches of representations and warranties in Article VII rather than put the disputed funds in escrow.[234]

Brody never sent a formal written notice of the Buyers' failure to pay, which would have triggered an "Event of Default" under the Note.[235] But the pre-trial

---

[233] Note § 3(a).

[234] *See* Dkt. 206; PTO ¶ I.A.7; *see also* Dkt. 172 (granting partial summary judgment in Brody's favor on his argument that the Buyers were obligated under Section 7.6(b)(iii) of the Purchase Agreements to put the disputed funds in escrow). The tax indemnification provision in Section 6.5(e) discussed above is not in Article VII. By the Purchase Agreements' terms, Section 6.5(e) is not included in the "adjustments" contemplated by the definition of "Purchase Price." MIPA § 2.2; SPA § 2.2 (stating that the purchase price is "subject to the adjustments provided for in this ARTICLE II and ARTICLE VII"). Although Section 6.5 also confers a right to reduce payments, it applies only to "any and all payments payable to the Selling Shareholders[/Members]." MIPA § 6.5(f); SPA § 6.5(f). The Note is only payable to Brody in his capacity as "Noteholder." Note '5567.

[235] Note §§ 3(a), 4; *see also* JX 266 (closing binder) Tab B.6 (iGEM Guaranty Agreement) '5585 ("Guaranty Agreement") § 1.

stipulation and Brody's pre-trial brief no doubt serve that purpose. In those documents, which were served on the Buyers,[236] Brody wrote that the Note was due in full and payable immediately due to an event of default.[237] The Buyers were therefore on notice of DCiM's default by October 4, 2024—at the latest.[238] At that point in time, DCiM's debt to Brody became due.[239]

Brody's opening post-trial brief also informed the Buyers that DCiM had failed to make good on its debt, which served as written notice to iGEM of DCiM's non-payment under the Guaranty Agreement.[240] The Buyers lacked grounds to withhold that portion of the purchase price at that point. By failing to pay Brody the outstanding principal and interest on the Note, the Sellers breached obligations under the Purchase Agreements, Note, and Guaranty Agreement.

---

[236] *See* Note § 7.

[237] PTO ¶ IV.A.i; Pl. and Countercl. Def. Richard Brody's Pre-trial Br. (Dkt. 260) 32-33.

[238] *See* Dkt. 260.

[239] Note § 3(a).

[240] Guaranty Agreement § 1 ("Guarantor shall not be required to pay the Guaranteed Indebtedness unless and until it receives written notice from the Noteholder . . . of DCiM's failure to pay prior to the expiration of the Grace Period the principal and interest amount that has become due and payable by DCiM to the Noteholder under the Note. Guarantor shall pay such due and owing Guaranteed Indebtedness within five (5) Business Days of receiving the [n]otice."). The Guaranty Agreement states that "delivery of the notice to [iGEM] by [Brody] pursuant to Section 3(a) of the Note shall not constitute delivery of the Payment Notice under . . . Section 1" of the Guaranty Agreement. Guaranty Agreement § 1.

3. Equitable Estoppel

The Buyers argue that "[b]ecause Brody engaged in fraudulent or similar conduct that caused [the Buyers] to overpay for the [c]ompanies by millions of dollars prior to the entry of the Purchase Agreements, he is equitably estopped from recovering on the Note."[241] To succeed on this affirmative defense,[242] the Buyers must prove:

> (1) conduct by the party to be estopped that amounts to a false representation, concealment of material facts, or that is calculated to convey an impression different from, and inconsistent with that which the party subsequently attempts to assert, (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth, (3) the intention or expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other, and (4) action or forbearance by the other party amounting to a change of status to his detriment.[243]

"[T]he standards for establishing the elements of equitable estoppel are stringent; the doctrine is applied cautiously and only to prevent manifest injustice."[244]

---

[241] Buyers' Opening Br. 47.

[242] During post-trial arguments, the Buyers conceded that equitable estoppel is an affirmative defense, not a claim (as it was pleaded). Post-trial Tr. 85-86. Equitable estoppel is instead a defense under Court of Chancery Rule 8. Ct. Ch. R. 8(c)(2) ("If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the Court must, if justice requires, treat the pleading as though it were correctly designated, and may impose terms for doing so.").

[243] *Olson v. Halvorsen*, 2009 WL 1317148, at *11 (Del. Ch. May 13, 2009) (quoting *Cornerstone Brands, Inc. v. O'Steen*, 2006 WL 2788414, at *3 n.12 (Del. Ch. Sept. 20, 2006)), *aff'd*, 986 A.2d 1150 (Del. 2009).

[244] *Pilot Point Owners Ass'n v. Bonk*, 2008 WL 401127, at *2 (Del. Ch. Feb. 13, 2008).

The Buyers cannot prevail on this defense for many of the same reasons that their fraud claim failed. Brody knew that the Buyers were relying on his representations and warranties, and some of those representations proved false. But the record lacks credible evidence suggesting that Brody had actual or constructive knowledge that there were significant unpaid sales and use taxes.[245] The Buyers have also not shown that they lacked means to learn the truth while they had access to the Sellers' books and records during due diligence.[246] The Sellers are not estopped from recovering on the Note.

## III. REMEDIES

On the one hand, the Note is owed to Brody and remains unpaid. On the other hand, the Buyers purchased companies with greater tax liabilities than they anticipated. A balanced resolution of these competing interests would seem equitable. Yet the trial record on the remaining claims leaves no measure to offset the Note, making the remedy one of the more challenging aspects of this case.

Because the audit process was never completed, I cannot say with any certainty that no working capital adjustments to the Note are technically called for.

---

[245] *See supra* Section II.A.1.b.

[246] Despite finding discrepancies in the Sellers' disclosures, the Buyers chose not to question the Sellers' tax liabilities until after closing. *See* JX 247; McClain Tr. 362; *cf. NetApp, Inc.*, 2023 WL 4925910, at *14 ("[A] party who gains actual knowledge of the falsity of a representation, structures a contract to address the risk of loss associated with the false representation, and proceeds to closing cannot claim justifiable reliance." (citing *Metro Commc'n*, 854 A.2d at 147)).

The only audit report completed for iGEM was inconsistent with the Purchase Agreements, and no report was ever produced for DCiM. Ideally, I would order the parties to complete the audit process to determine whether any adjustments to the Note are warranted. But the audit process was abandoned years ago, after the Buyers threatened the Auditor and refused to engage the Auditor to complete its work.[247]

Because the Sellers also had undisclosed tax liabilities upon closing, it would be ideal to offset the Note by the balance of any proven breaches of representations and warranties. But the Buyers foreclosed that path as well when chose to drop those claims to avoid placing the disputed funds in escrow. That left them with fraud claims that they failed to prove at trial.

As to Brody, payments on the Note were to begin in 2017. Over eight years later, he has yet to see a penny of the $2 million balance. He proffered a rebuttal expert report calculating that with accrued interest, he is entitled to $3,422,094.48.[248] I cannot accept that sum for two reasons. First, these calculations reflect affirmative—not rebuttal—expert work.[249] Second, until service of Brody's pre-trial

---

[247] One would expect that the Auditor has no interest in resuming this engagement under any terms.

[248] JX 441 (Pina Rep.) 37. This amount is less the $50,000 paid to the State of Washington.

[249] The Buyers previously filed a motion in limine seeking to exclude Pina's testimony for this reason. JX 247. In denying the motion in limine, I noted that I would not give it weight if it was found to constitute improper rebuttal testimony. *See* JX 273 at 26-27, 40-41.

brief and the pre-trial order, I have no record that DCiM received a written notice of default on the Note.

This leads to a somewhat unsatisfying result, with neither party obtaining what they feel they are entitled to.

The Buyers proved tax indemnification damages of only $49,289.52—the amount paid to the State of Washington for IIS's past due fees. DCiM is entitled to that sum plus prejudgment interest at the legal rate beginning on the date of its payment to the State of Washington.[250] The Buyers never paid the other outstanding liabilities they claim, leaving further indemnification under Section 6.5(e) of the Purchase Agreements unavailable.

The Note is due and payable to Brody, but only with (1) interest at the rate set by the Note accruing as of August 2013 when the Buyers dropped their Article VII claims, and (2) the default interest rate of 5% above the floor beginning on October 19, 2024 (i.e., 15 days after written notice of default).[251]

---

[250] Washington's invoice has a due date of July 6, 2020. JX 435. But I lack evidence of the date of payment by DCiM.

[251] *See supra* notes 229-230. The parties did not brief these specifics on pre-judgment interest. As noted at the conclusion of this decision, I ask that they confer on the appropriate interest figure in preparing a proposed order to implement this decision. *See infra* Section IV.

## IV.   CONCLUSION

Judgment on Brody's Counts I and III is entered in his favor, as set forth above.  Judgment on the Buyers' Counts I, III, and IV is also in Brody's favor. Judgment on the Buyers' Count II is entered in their favor, as set forth above.

The parties are to confer on a form of order to implement this decision.  That includes discussing the amounts of applicable prejudgment interest for the Buyers' tax indemnification damages and the interest owed to Brody under the Note.